# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 4, 2015          Decided August 14, 2015

No. 14-5325

JOSEPH M. ARPAIO,
APPELLANT

v.

BARACK OBAMA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01966)

———

*Larry Klayman* argued the cause and filed the briefs for appellant.

*Beth S. Brinkmann*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Benjamin C. Mizer*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *Scott R. McIntosh*, *Jeffrey Clair*, and *William E. Havemann*, Attorneys.

Before: BROWN, SRINIVASAN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Concurring opinion filed by *Circuit Judge* BROWN.

PILLARD, *Circuit Judge*: The Secretary of the Department of Homeland Security, facing what he perceives to be enormous practical obstacles to removing from the United States the eleven million people unlawfully present here, has sought to set enforcement priorities. He accordingly directed relevant agencies temporarily to defer low-priority removals of non-dangerous individuals so that the agencies can focus their resources on removing dangerous criminals and strengthening security at the border. People whose removal has been deferred are generally eligible to apply for authorization to work, and to reside in the United States for up to three years.

Joseph Arpaio, the Sheriff of Maricopa County, Arizona, sued to enjoin the Secretary's deferred action policies. He asserts that they are unconstitutional, arbitrary and capricious, and invalid under the Administrative Procedure Act as, in effect, regulations that have been promulgated without the requisite opportunity for public notice and comment. We cannot resolve those claims unless Sheriff Arpaio has Article III standing to raise them. To have standing, a plaintiff must have suffered or be about to suffer a concrete injury fairly traceable to the policies he challenges and redressable by the relief he seeks.

Sheriff Arpaio's standing arguments rest on the premise that more people causing more crimes harm him because, as Sheriff, he will be forced to spend more money policing the county and running its jails. He alleges two ways in which he believes that the population of undocumented aliens committing crimes will increase as a result of deferred action.

First, he contends that deferred action will act as a magnet drawing more undocumented aliens than would otherwise come across the Mexican border into Maricopa County, where they will commit crimes. Second, he alleges that the challenged policies will decrease total deportations by deferring action against approximately six million undocumented aliens, so that more individuals will remain unlawfully in Maricopa County and commit crimes than would be the case without deferred action.

We conclude that Sheriff Arpaio has failed to allege an injury that is both fairly traceable to the deferred action policies and redressable by enjoining them, as our standing precedents require. His allegations that the policies will cause more crime in Maricopa County are unduly speculative. Projected increases he anticipates in the county's policing burden and jail population rest on chains of supposition and contradict acknowledged realities.

Sheriff Arpaio recognizes that the deferred action policies he challenges apply only to people who are already present in the United States and who either arrived as children or are parents of children who are United States citizens or lawful permanent residents. His magnet theory nonetheless assumes that the policies will cause non-citizens outside of the United States to cross the border in the mistaken hope of benefitting from the current policies. Alternatively, Sheriff Arpaio posits that foreign citizens will view the current policies as a sign of things to come, and will therefore cross the border in the hope of benefitting from hypothesized future, similar policies that are not the subject of Sheriff Arpaio's challenge. Our precedents establish that standing based on third-party conduct—such as the anticipated reactions of undocumented aliens abroad—is significantly harder to show than standing based on harm imposed by one's litigation adversary. That

difficulty is compounded here because the third-party conduct the complaint forecasts depends on large numbers of people having the same unlikely experiences and behaviors: For the harms Sheriff Arpaio alleges to occur and be redressable by the injunction he seeks, aliens abroad would have to learn about the deferred action policies, mistakenly think that they were eligible to benefit from them, or harbor a hope of becoming eligible for future, similar policies as yet unannounced, actually leave their homes and enter the United States illegally based on that false assumption, commit crime in Maricopa County, become involved in—and costly to—the criminal justice system there, and be less likely under deferred action to be removed from the United States than they would have been without those policies in place.

Sheriff Arpaio's second standing theory is no less tenuous. Sheriff Arpaio recognizes that only non-dangerous immigrants are eligible for deferred action, but he nonetheless contends that those deferrals will mean that crime by undocumented aliens will be higher than it would be without them. This second theory rests on the mistaken premise that the challenged policies decrease the number of removals below what would have been accomplished had the policies not been adopted. Accurately read, however, the policies seek not to decrease the total number of removals but to prioritize removal of individuals who pose a threat to public safety over removal of those who do not. The policy is designed to make the Department of Homeland Security's expenditure of resources more efficient and effective. Even if it were plausibly alleged (and it is not) that the challenged policies would mean more undocumented aliens remain in the county, the reduced-removals theory also depends on unsupported speculation that these policies, expressly confined to individuals who do not pose threats to public safety, will increase the number of crimes in Maricopa County above

what could reasonably be anticipated in the absence of any such policies.

Because Sheriff Arpaio's allegations of causation and redressability rest on speculation beyond that permitted by our standing decisions, we affirm the district court's dismissal of the complaint for want of Article III standing.

## I.

### A.

The nation's immigration laws provide for the removal from the United States of people who were "inadmissible at the time of entry," or who commit certain offenses or meet other criteria for removal. *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). The Secretary of Homeland Security is "charged with the administration and enforcement" of the immigration laws. 8 U.S.C. § 1103(a)(1). With enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The Supreme Court has particularly recognized that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499. Whether to initiate removal proceedings and whether to grant relief from deportation are among the discretionary decisions the immigration laws assign to the executive. *Id.*

In making immigration enforcement decisions, the executive considers a variety of factors such as the danger posed to the United States of an individual's unlawful presence, the impact of removal on the nation's international

relations, and the "human concerns" of whether the individual "has children born in the United States, long ties to the community, or a record of distinguished military service." *Id.* More generally, the Supreme Court has recognized that all agencies have discretion to prioritize in light of the Secretary's and, ultimately, the President's assessments "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Heckler*, 470 U.S. at 831.

One form of discretion the Secretary of Homeland Security exercises is "deferred action," which entails temporarily postponing the removal of individuals unlawfully present in the United States. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999). Immigration authorities have made decisions to defer action or take similar measures since the early 1960s. *See The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present* ("OLC Op."), 38 O.L.C. Op. ----, pp. 7-8, 12-13 (Nov. 19, 2014). For example, in 1990, the Immigration and Naturalization Service implemented a "Family Fairness" program that deferred removal of and provided work authorizations to approximately 1.5 million individuals whose spouses or parents had been granted legal status in the United States under the Immigration and Reform Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359. OLC Op. at 14. Approximately forty percent of individuals unlawfully present in the United States at that time were potentially eligible for the program. *Id.* at 31.

Today, the Department of Homeland Security estimates that there are approximately 11.3 million people in the United States who may be subject to removal under the immigration laws. *See id.* at 1. Of those, the Department estimates that it has the resources to remove fewer than 400,000 each year. *Id.* In an effort to allocate the Department's limited resources, Secretary Janet Napolitano in June 2012 directed relevant agencies "to ensure that our enforcement resources are not expended on . . . low priority cases but are instead appropriately focused on people who meet our enforcement priorities." Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012), J.A. 101. In what became known as Deferred Action for Childhood Arrivals, or DACA, the Secretary outlined a policy to defer removal proceedings for two years, subject to renewal, of individuals who came to the United States as children, met certain eligibility criteria, and cleared a background check. *Id.* at 1-2. Those eligible for DACA could identify themselves to the Department for individualized review and, if eligible, receive temporary deferral and authorization, on a case-by-case basis, to work in the United States. *Id.* at 3. The memorandum emphasizes, however, that deferred action remains discretionary and reversible, and "confers no substantive right, immigration status or pathway to citizenship." *Id.*

In November 2014, Jeh Johnson, Napolitano's successor as Secretary of Homeland Security, revised the DACA program by extending it to more childhood arrivals and extending to three years the deferred action and work authorization periods. Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are Parents of U.S.*

*Citizens or Permanent Residents* 1 (Nov. 20, 2014), J.A. 145. In addition, the Secretary outlined a second deferred action policy for the parents of United States citizens and lawful permanent residents, which has become known as Deferred Action for Parents of Americans, or DAPA. *Id.* at 4-5. Parents seeking to take part in DAPA must meet similar eligibility requirements as DACA beneficiaries, and they, too, must clear a background check. *Id.* Neither DACA nor DAPA applies to individuals who arrived in the United States after January 1, 2010. *Id.* at 4.

The Secretary explained that DACA and DAPA apply to individuals who "are extremely unlikely to be deported given [the] Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security." *Id.* at 3. In a separate memorandum issued on the same day, the Secretary revised the Department's enforcement priorities. Memorandum from Jeh Charles Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* 1 (Nov. 20, 2014), J.A. 154. One of the eligibility requirements of DACA and DAPA is that individuals must not fall under any of three enforcement priority categories. The first applies to "threats to national security, border security, and public safety," i.e., those engaged in or suspected of terrorism or espionage, apprehended at the border or ports of entry attempting to enter the United States unlawfully, convicted of an offense involving participation in gangs or organized crime, or convicted of a felony or aggravated felony. *Id.* at 3. The second category applies to those convicted of three or more offenses (not including traffic- or immigration-related offenses), or of a single "significant misdemeanor," including crimes of violence, drug distribution or trafficking, driving under the influence of an impairing substance, and any other misdemeanor that resulted

in more than ninety days' incarceration. *Id.* at 3-4. The third category applies to individuals who have been issued a final order of removal on or after January 1, 2014. *Id.* at 4.

DACA and DAPA therefore apply to the portion of the population that the Department considers not threatening to public safety and that has not had any involvement, or only minimal and minor involvement, with the criminal justice system. Although estimates of this kind are notoriously difficult to make, it appears that up to about six million of the 11.3 million individuals subject to removal from the United States may be eligible either for DACA or DAPA.[1]

**B.**

On the same day that the President announced the revisions to DACA and the new DAPA policy, the elected Sheriff of Maricopa County, Arizona, Joseph Arpaio, sued the President and other federal officials seeking a declaration and preliminary injunction that DACA and DAPA violate the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and the non-delegation doctrine.

---

[1] Sheriff Arpaio claims throughout his briefing, without citation, that the total number of DACA- and DAPA- eligible individuals is six million. The Department estimates that four million people may be eligible for DAPA, but acknowledges the difficulty of arriving at accurate estimates. *See* OLC Op. at 30. We have found no estimate of DACA eligibility in the record, but one court has noted that some observers expect the number of eligible individuals to reach 1.7 million, *Texas v. United States*, No. CIV. B-14-254, --- F. Supp. 3d ---, 2015 WL 648579, at *4 (S.D. Tex. Feb. 16, 2015), bringing the combined total to 5.7 million. The Sheriff's estimate thus appears reasonable.

Maricopa County is the fourth most populous county in the nation, and the most populous by far in Arizona. It stands thirty miles from the United States' border with Mexico. Sheriff Arpaio alleges that he was "adversely affected and harmed in his office's finances, workload, and interference with the conduct of his duties, by the failure of the executive branch to enforce existing immigration laws" through adoption of DACA in 2012. Compl. ¶ 27. He asserts that his office has been "severely affected" by increases in unlawful entries that he alleges were motivated by the President's "amnesty" policies, and he predicted further unlawful entries due to the policies announced in 2014. *Id.* In a declaration, Sheriff Arpaio avers that the increased number of unlawful arrivals in Maricopa County after DACA was first adopted in 2012 imposed costs on his office in terms of "manpower and financially" because some of those individuals who arrived without documentation ended up in the Sheriff's jails, and others committed offenses that required additional investigation on the part of the Sheriff's office. Supp'l Arpaio Decl., J.A. 656-58 ¶¶ 12, 18-20, 27.

The district court denied a preliminary injunction and dismissed the complaint for lack of subject matter jurisdiction because Sheriff Arpaio had failed to allege a cognizable injury in fact for purposes of Article III standing. *Arpaio v. Obama*, 27 F. Supp. 3d 185, 192, 207 (D.D.C. 2014). The court held that Sheriff Arpaio presents a non-justiciable "generalized grievance," as opposed to a particularized injury. *Id.* at 202. If it recognized Sheriff Arpaio's standing to bring these claims, the court opined, it "would permit nearly all state officials to challenge a host of Federal laws simply because they disagree with how many—or how few—Federal resources are brought to bear on local interests." *Id.* The district court also concluded that Arpaio lacked standing because his claimed injury was "largely speculative." *Id.* at

203. The court found implausible the contention that "the challenged deferred action programs will create a 'magnet' by attracting new undocumented immigrants into Maricopa County, some of whom may commit crimes under Arizona law." *Id.* Sheriff Arpaio's theory treats as a certain and immediate effect of the challenged programs, the court held, migration decisions that are in reality "complex decision[s] with multiple factors, including factors entirely outside the United States' control, such as social, economic and political strife in a foreign country." *Id.* Sheriff Arpaio timely appealed.

## II.

We review de novo the district court's dismissal for lack of standing. *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1273 (D.C. Cir. 2007). The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The "irreducible constitutional minimum of standing contains three elements": injury in fact, causation, and redressability. *Id.* at 560-61. Injury in fact is the "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks and citations omitted). The "causal connection between the injury and the conduct complained of" must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 561 (internal quotation marks and alterations omitted). And it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted). Finally, because Sheriff Arpaio seeks prospective declaratory and

injunctive relief, he must establish an ongoing or future injury that is "certainly impending"; he may not rest on past injury. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (emphasis omitted).

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Consequently, because the Department challenges the adequacy of Sheriff Arpaio's complaint and declarations to support his standing, we accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor, as we do in reviewing dismissals for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nevertheless, "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Id.* We do not assume the truth of legal conclusions, *id.*, nor do we "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [of standing] that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III.

The Sheriff's Office's expenditures of resources on criminal investigation, apprehension, and incarceration of criminals are indeed concrete, but Sheriff Arpaio lacks standing to challenge DACA and DAPA because any effects of the challenged policies on the county's crime rate are unduly speculative.

13

**A.**

Sheriff Arpaio's standing theory relies on a predicted chain of events, as follows: Under the challenged policies, the Secretary of Homeland Security will refrain from removing DACA and DAPA beneficiaries. Foreign citizens outside of the United States and ineligible for either DACA or DAPA will learn of those policies. Those people will either mistakenly believe that they are eligible to benefit from them, or conjecture that the policies make it likely that the federal government will adopt a future, similar policy of deferred action for which they would be eligible. Relying on such surmise, those individuals will decide to enter the United States unlawfully, stimulated by the hope of obtaining relief from deportation. Some of those new arrivals will settle in Maricopa County. And some subset of those, contrary to their own plans to benefit from anticipated deferred action or removal opportunities restricted to non-criminal aliens, will commit crimes. The portion of those who are investigated, arrested, or jailed by the Sheriff's Office will cause an increased expenditure of resources. *See* Supp'l Arpaio Decl. ¶ 18. It is that predicted expenditure of resources that Sheriff Arpaio seeks to redress through this suit.

Any injury Sheriff Arpaio suffers from the financial burdens imposed by new arrivals would not be fairly traceable to DACA or DAPA. Neither DACA nor DAPA applies to people who entered the United States after January 1, 2010, and thus plainly neither applies to entrants arriving now or in the future. Sheriff Arpaio argues that foreign citizens will see DACA and DAPA as harbingers of the federal government's future immigration policies, and so be encouraged to enter the United States unlawfully. Even if the causal links in that attenuated chain were adequately alleged, the decisions of such individuals to enter the United States unlawfully lack

any legitimate causal connection to the challenged policies. Just as the law does not impose liability for unreasonable reliance on a promise, *see* Restatement (Second) of Contracts § 90 (1981), it does not confer standing to complain of harms by third parties the plaintiff expects will act in unreasonable reliance on current governmental policies that concededly cannot benefit those third parties. We are aware of no decision recognizing such an attenuated basis for standing. *See Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("[T]he mere possibility that causation is present is not enough; the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied.").

Even were we to ignore the disconnect between the challenged policies and the increased law enforcement expenditures that Sheriff Arpaio predicts, his reliance on the anticipated action of unrelated third parties makes it considerably harder to show the causation required to support standing. The injuries Sheriff Arpaio predicts would stem not from the government's DACA or DAPA programs, but from future unlawful entrants committing crimes in Maricopa County after their arrival. Although "standing is not precluded" in a case that turns on third-party conduct, "it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted). We have required "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004); *see also Renal Physicians*, 489 F.3d at 1275.

Likewise, because Sheriff Arpaio must rest his claims for declaratory and injunctive relief on predicted future injury, *see Clapper*, 133 S. Ct. at 1147, he bears a "more rigorous burden" to establish standing, *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989). We must take the complaint's allegations "of facts, historical or otherwise demonstrable," as true. *Id.* at 912. But we treat "allegations that are really predictions" differently. *Id.* "When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)," as well as predictions of future injury that are "not normally susceptible of labelling as 'true' or 'false.'" *Id.* at 913. In order to establish standing premised on future injury, Sheriff Arpaio "must demonstrate a realistic danger of sustaining a direct injury." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Sheriff Arpaio asserts that he is entitled to proceed based on a lenient assessment of his alleged concrete injury, because his complaint includes a claim of procedural injury from violation of the Administrative Procedure Act. That contention mischaracterizes our procedural injury cases. "[T]hough the plaintiff in a procedural-injury case is relieved of having to show that proper procedures would have caused the agency to take a different substantive action, the plaintiff must still show that the agency action was the cause of some redressable injury to the plaintiff." *Renal Physicians*, 489 F.3d at 1279.

Here, Sheriff Arpaio's allegations that DACA and DAPA will cause unlawful immigration to increase are conjectural and conclusory. *See, e.g.*, Suppl. Arpaio Decl. ¶¶ 16-17. The only relevant specifics appear not in his pleadings, but in his

brief, where he points to the "flood of unaccompanied minors in the Summer of 2014 crossing the Mexican border"—an increase that he attributes to Secretary Napolitano's June 2012 DACA memorandum. Arpaio Br. 17. He argues that we may extrapolate from that experience that the revised DACA and new DAPA policies will cause increased unlawful immigration in the future. Even if we could credit an assertion in a brief as if it were alleged in a pleading, *see Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1057 (7th Cir. 1988) ("[A]ssertions contained only in the briefs may not be used to expand the allegations of the complaint."), Sheriff Arpaio's argument nonetheless suffers from the logical fallacy *post hoc ergo propter hoc* (after this, therefore because of this). Just as we do not infer that the rooster's crow triggers the sunrise, we cannot infer based on chronology alone that DACA triggered the migrations that occurred two years later.

Sheriff Arpaio provides no factual allegations to link the 2014 "flood" of minors to DACA. The record reveals only speculation about the complex decisions made by non-citizens of the United States before they risked life and limb to come here. While immigration policies might have played into that calculus, so, too, might the myriad economic, social, and political realities in the United States and in foreign nations. Even assuming that it is conceivable that inaccurate knowledge of DACA could have provided some encouragement to those who crossed the southern border, the Supreme Court's precedent requires more than illogic or "unadorned speculation" before a court may draw the inference Sheriff Arpaio seeks. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).

Moreover, even if we were to assume DACA and DAPA increase unlawful immigration, we cannot further infer that

they increase crime. At base, Sheriff Arpaio's contention is that more immigrants mean more crime. There is simple appeal to the notion that, all else being equal, more people will commit more crime. But the reality is that crime is notoriously difficult to predict. Explaining its causes, even after the fact, is rife with uncertainty. Crime rates are affected by numerous factors, such as the local economy, population density, access to jobs, education, and housing, and public policies that directly and indirectly affect the crime rate. Even if it were possible to do so, Sheriff Arpaio does not explain how increased migration would interact with those and other factors affecting the crime rate. On this record, it is pure speculation whether an increase in unlawful immigration would result in an increase, rather than a decrease or no change, in the number of crimes committed in Maricopa County. Where predictions are so uncertain, we are prohibited from finding standing. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (holding that a class of African Americans and civil rights activists lacked standing to challenge an alleged pattern and practice of selective and discriminatory criminal law enforcement because "attempting to anticipate whether and when these respondents will be charged with crime . . . takes us into the area of speculation and conjecture").

We faced one example of the obstacles to standing based on predicted harms flowing from third-party conduct in *Northwest Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986). Northwest Airlines sought to challenge the FAA's decision to certify a pilot to continue flying after the airline discharged him for flying while intoxicated. The airline argued that "allowing unfit pilots in the skies endangers all others who fly and confers upon [the endangered parties] standing to challenge any . . . certification decision." *Id.* at 201. We reiterated that the standing requirements "will not be

satisfied simply because a chain of events can be hypothesized in which the action challenged eventually leads to actual injury." *Id.* Consequently, we held that the airline lacked standing because the "possibility" that the pilot would be hired by another airline, fly in the same region as the plaintiff airline, and actually cause injury to the plaintiff's passengers and crew was "too remote and speculative to constitute injury." *Id.* Just as the airline's challenge to the FAA's decision to treat an alcoholic pilot leniently was premised on the airline's hypothesis that the decision created a "marginally increased possibility" that the pilot would engage in unlawful behavior, *id.* at 202, Sheriff Arpaio's challenge to the Department of Homeland Security's deferred action policies rests on his hypothesis that they will lead to increased unlawful behavior. Both theories suffer from the same weakness: "the likelihood of any injury actually being inflicted [is] too remote to warrant the invocation of judicial power." *Id.*[2]

---

[2] Sheriff Arpaio also argues that we are required to draw the inference that "a demonstrated willingness to break this nation's laws to get what one wants but is not entitled to, experiencing a widespread outcry excusing their law-breaking, and suffering no consequences constitute valid grounds for predicting a lowered resistance to breaking more laws." Arpaio Br. 46. Not so. Sheriff Arpaio has made no factual allegations that might support his asserted connection between the decision to enter the United States unlawfully and the propensity to commit other crimes. *See Islamic Am. Relief Agency*, 477 F.3d at 732 ("This Court need not . . . accept inferences that are unsupported by the facts set out in the complaint."). Even if he had, he has not contended with the legal hurdle posed by courts' general reluctance to predict propensities to commit crime in the future. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) ("[I]t is surely no more than speculation to assert either that Lyons himself will again be" arrested and

Sheriff Arpaio contends that cases recognizing competitor standing support his reliance on anticipated future harm. In certain circumstances, we have found standing premised on the federal government's favorable regulatory treatment of a plaintiff's competitor. Plaintiffs may claim predictable economic harms from the lifting of a regulatory restriction on a "direct and current competitor," *Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014) (internal quotation marks and emphasis omitted), or regulatory action that enlarges the pool of competitors, which will "almost certainly cause an injury in fact" to participants in the same market, *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010). But we have not hesitated to find competitor standing lacking where the plaintiff's factual allegations raised only "'some vague probability'" that increased competition would occur. *Id.* at 74 (quoting *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (2001)). Because of the generally contingent nature of predictions of future third-party action, we have remained sparing in crediting claims of anticipated injury by market actors and other parties alike. *See United Transp. Union*, 891 F.2d at 912 n.7 (distinguishing "allegations of future injury that are firmly rooted in the basic laws of economics" from other allegations of future injury). Sheriff Arpaio's theory that more immigrants mean more crime is not sufficiently analogous to the basic laws of economics for our competitor standing cases to apply.

Finally, we note that the Fifth Circuit's recent decision in *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015), does not support Sheriff Arpaio's standing. That court found that the State of Texas had standing to challenge DAPA because it would be required to issue driver's licenses to DAPA

---

subjected to a chokehold by resisting arrest.); *O'Shea v. Littleton*, 414 U.S. at 497; *cf. Nw. Airlines*, 795 F.2d at 201.

beneficiaries. *Id*. at 748-54. Texas offers driver's licenses at a substantially subsidized price; it loses $130.89 on each license it issues. *Id*. at 748. DAPA renders the approximately 500,000 of its beneficiaries who reside in Texas eligible to obtain Texas driver's licenses. *Id*. at 752. Texas alleged that anyone who qualifies under DAPA also by the same token qualifies for a Texas license. Such an increase in the numbers of persons eligible for Texas driver's licenses, the Fifth Circuit reasoned, has the "direct and predictable effect" of imposing costs on the state. *Id*. Assuming arguendo the correctness of that conclusion, here, by contrast, the record reveals nothing from which we may draw the inference that the "direct and predictable effect" of the challenged policies will be an increase in the costs to Sheriff Arpaio's office of responding to crime. Sheriff Arpaio's contention is, at bottom, premised on the speculative prediction that DACA and DAPA will create incentives on third parties to behave in misinformed or irrational ways that would harm him. The claim in *Texas*, by contrast, was that undocumented aliens immediately become eligible for the license benefit by dint of becoming DAPA beneficiaries. Insofar as those circumstances pose "actual and imminent" concrete harm to Texas, we face a significantly different situation here. *See id.* at 744-45, 751.

## B.

Sheriff Arpaio's argument in the district court focused on the harms he anticipates from an increased number of people unlawfully crossing the border. On appeal, his standing theory focuses more on a separate prediction that fewer of the undocumented aliens *already* in the United States will be removed under the new policies than would have been removed without them. *See* Oral Arg. Tr. 15:6-10. Under this second theory, Sheriff Arpaio argues that he will be

injured because some portion of the six million people who might benefit from deferred action will remain in Maricopa County rather than being removed, and some portion of those will commit crimes. This theory rests on the unsupported assumption that the total removals will drop due to DACA and DAPA, plus the speculation that those programs' beneficiaries will increase the crime rate.

A crucial assumption behind this standing claim is that, but for the challenged policies, the government would be able promptly to remove individuals eligible for DACA or DAPA. But Sheriff Arpaio does not dispute that the Department of Homeland Security has the resources only to remove fewer than 400,000 undocumented aliens per year. *See* Hrg. Tr., J.A. 718-19. Indeed, he repeatedly alleges that, before DACA and DAPA, the government was removing far fewer undocumented aliens from Maricopa County than he thought was appropriate. But Sheriff Arpaio does not generally challenge what he calls the executive's failure to enforce the immigration laws; his claims are directed only to DACA and DAPA. Neither those policies, nor the Department of Homeland Security that administers them, contemplates the net removal of fewer individuals under the policies than under the status quo ante.

The relevant question, then, is not whether the government will remove fewer undocumented aliens under the challenged policies than without them, but whether the shift in removal priorities that DACA and DAPA reflect will cause an increase in crime in Maricopa County. Sheriff Arpaio's prediction of an increase in undocumented aliens committing crime runs contrary to the thrust of those policies. DACA and DAPA apply only to non-dangerous immigrants. They are designed to allow the Department to focus its resources on removing those undocumented aliens most

disruptive to the public safety and national security of the United States. To qualify for DAPA or DACA, individuals must pass a background check, have long-term ties to the United States, and submit to individualized assessments for compatibility with the Secretary's priorities in removing criminals. Even after they are approved for deferred action, DAPA and DACA beneficiaries are subject to the Department's overall enforcement priorities. They get no free pass to commit offenses, whether dangerous or otherwise serious; those types of offenders remain high priorities for removal from the United States.

The flaw in Sheriff Arpaio's logic is fatal to his claim. *See Renal Physicians*, 489 F.3d at 1278. The challenged policies seek to increase the proportion of removal proceedings and deportations of those who pose a threat to public safety or national security. The policies are designed to remove *more* criminals in lieu of removals of undocumented aliens who commit no offenses or only minor violations while here. To the extent that such predictions are possible, if the programs are successful by their own terms, the number of crimes committed by undocumented aliens in Maricopa County should drop. Sheriff Arpaio has not explained how making the removal of criminals a priority over the removal of non-dangerous individuals will instead result in an increase in crime.[3] This is thus not a case in

---

[3] The Fifth Circuit recently acknowledged a similar flaw in Mississippi's challenge to DACA. Mississippi's claim of injury was not supported by facts showing that DACA-eligible undocumented aliens would impose increased costs on the state. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015). The Fifth Circuit observed that it could instead be the case, as the Department of Homeland Security argued and contrary to Mississippi's contentions, "that the reallocation of DHS's assets is resulting in the removal of immigrants that impose a greater financial burden on

which the plaintiff and defendant each present plausible explanations for the facts alleged. *See Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011). Dismissal is required because the "plausible alternative explanation" that DACA and DAPA will result in fewer crimes in Maricopa County, not more, "is so convincing that [the] plaintiff's explanation is *im*plausible." *Id.*; *see also Renal Physicians*, 489 F.3d at 1277.

* * *

We have observed that the "complexity and interdependence of our society and governmental policies" enable prospective plaintiffs to allege theories of causation that, though severely attenuated, carry with them "some plausibility." *Nw. Airlines*, 795 F.2d at 203 n.2. "If such allegations were routinely accepted as sufficient to confer standing, courts would be thrust into a far larger role of judging governmental policies than is presently the case, or than seems desirable." *Id.* We must rigorously review allegations by plaintiffs who seek to invoke the subject matter jurisdiction of the federal courts based on the projected response of independent third parties to a challenged government action. In this case, Sheriff Arpaio's standing allegations fall short. For these reasons, we hold Sheriff Arpaio lacks standing to challenge DACA and DAPA.

Accordingly, we affirm the judgment of the district court.

*So ordered.*

---

the state," and, if so, DACA's "net effect would be a reduction in the fiscal burden on the state." *Id.* The court affirmed dismissal of the case for want of "a sufficiently concrete and particularized injury that would give Plaintiffs standing to challenge DACA." *Id.* at 255.

BROWN, *Circuit Judge*, concurring: Today we hold that the elected Sheriff of the nation's fourth largest county, located mere miles from our border with Mexico, cannot challenge the federal government's deliberate non-enforcement of the immigration laws. I agree with my colleagues that the state of the law on standing "requires, or at least counsels, the result here reached." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 798 (D.C. Cir. 1987). But, recognizing that Sheriff Arpaio's claims reflect the wide-spread perception that the administration's prosecutorial discretion meme is constitutionally problematic, I write separately to emphasize the narrowness of today's ruling, and note the consequences of our modern obsession with a myopic and constrained notion of standing.

\* \* \*

Sheriff Joseph Arpaio of Maricopa County, Arizona, filed suit to prevent the President from implementing programs deferring the removal of certain undocumented immigrants from the United States. These programs, referred to as Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans (DAPA), generally delay removal proceedings for undocumented immigrants who pass a background check and satisfy specified eligibility criteria. *See* Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012), J.A. 101; Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and With Respect to Certain Individuals Who are Parents of U.S. Citizens or Permanent Residents* 1 (Nov. 20, 2014), J.A. 145. Those who qualify receive authorization to work and reside in the United States for renewable periods.

What the government views as permissible prosecutorial discretion, Sheriff Arpaio views as a violation of the President's duty to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, and the non-delegation doctrine. Sheriff Arpaio also identifies potential procedural violations, contending the orders fail to comply with notice-and-comment procedures required by the Administrative Procedure Act.

Sheriff Arpaio's problems with the challenged policies run deeper than a difference in philosophy or politics. He claims DACA and DAPA impose clear and "severe[]" harms on his ability to protect the people of Maricopa County. Compl. ¶ 27. In particular, he argues that deferring removal proceedings and providing work authorizations to undocumented immigrants "harmed . . . his office's finances, workload, and interfere[d] with the conduct of his duties . . . ." *Id.* He attributes an influx of undocumented immigrants to the Department's non-enforcement policies, and claims it corresponded with a rise in crime. Increased crime means increased costs for the Sheriff, who must run the jails and provide deputies to police the streets.

\* \* \*

Sheriff Arpaio's concerns are no doubt sincere. But, as the court concludes, we cannot hear his claims because he lacks standing to proceed. Under our standing jurisprudence, the injuries he claims resulted from DACA and DAPA are simply too inexact and speculative. Consequently, we must affirm the district court's dismissal of the complaint.

Some may find today's outcome perplexing. Certainly Sheriff Arpaio cannot be blamed for believing he had standing. The relevant judicial guideposts do not exactly

"define[]" standing "with complete consistency." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982). And some cases suggest standing can be satisfied based on fairly ephemeral injuries and attenuated theories of causation. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 516–26 (2007).

Indeed, at first blush, Sheriff Arpaio's allegations appear somewhat similar to those the Supreme Court found sufficient to secure standing in *Massachusetts v. EPA*. That case revolved around EPA's decision not to regulate greenhouse gas emissions in new vehicles. Then, as now, standing consisted of a tripartite test. Plaintiffs must show they were or will be concretely injured by an action fairly traceable to the defendant and redressable by the court. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998). The rules are somewhat relaxed for plaintiffs who, like Massachusetts and Sheriff Arpaio, seek to vindicate a procedural right, including "the right to challenge agency action unlawfully withheld." *Massachusetts*, 549 U.S. at 517. Procedural rights claims can proceed "without meeting all the normal standards for redressability and immediacy." *Id.* at 517–18 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)). Massachusetts received a further benefit. As a sovereign state, it was "entitled to special solicitude in [the] standing analysis." *Id.* at 520.

Massachusetts, like Sheriff Arpaio, believed the federal government had "abdicated its [statutory] responsibility" to protect the State's interests. *Id.* at 505. The State, like the Sheriff, asked the Court to construe the meaning of a federal statute, "a question eminently suitable to resolution in federal court." *Id.* at 516. And Congress had authorized challenges to the EPA, *id.*, just as Congress has generally authorized the type of challenge Sheriff Arpaio now pursues, *see* 5 U.S.C. §

704; *see also Texas v. United States*, 787 F.3d 733, 751–52 (5th Cir. 2015).

The Supreme Court ultimately found that Massachusetts' injury lay in the potential loss of coastal land caused by the threat of rising seas. The Court said "the rise in sea levels associated with global warming has already harmed and will continue to harm Massachusetts." *Massachusetts*, 549 U.S. at 526. Scientific evidence suggested a causal relationship between greenhouse gases and atmospheric warming. The Court brushed aside EPA's argument that Massachusetts had only a generalized grievance widely shared by others. The global nature of global warming did not negate the state's claimed concrete injury. *See id.* at 522–23.

Just as EPA's inaction harmed Massachusetts' shores, inaction on immigration is said to harm Sheriff Arpaio's streets. Immigration, like global warming, affects the entire nation. But that does not mean no one has standing to challenge the concrete effects of the federal government's immigration policies. "[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *FEC v. Akins*, 524 U.S. 11, 24 (1998).

Based on these facial similarities, someone in Sheriff Arpaio's shoes may well believe he has standing. After all, *Massachusetts* sets out a "loosened standard" under which "*any* contribution of *any* size to a cognizable injury" seems to be "sufficient for causation, and *any* step, no matter how small," seems to be "sufficient to provide the necessary redress." Jonathan H. Adler, *Standing Still in the Roberts Court*, 59 CASE W. RES. L. REV. 1061, 1078 (2009). Under that elastic framework, the *risk* of harm, however tenuously linked to the challenged government action, appears to suffice to show standing.

Despite initial appearances, *Massachusetts* does not support the Sheriff's standing. Preliminarily, perhaps sensing that Massachusetts' broad-based claim could not satisfy the ordinary rules of standing, the Court lowered the bar, ruling that state litigants were "entitled to special solicitude" in the standing calculus. *Massachusetts*, 549 U.S. at 520. In addition to being special, the solicitude the *Massachusetts'* Court manufactured was highly selective: cast in concerns over state sovereignty, *see id.* at 518–20, this bit of doctrinal favoritism likely does not extend to non-state litigants like the Sheriff, who must clear the ordinary hurdles to standing. The Sheriff falls short, largely for the reasons addressed below.

Without the laxity afforded to state litigants, Sheriff Arpaio's arguments for causation are overly speculative. At bottom, Sheriff Arpaio avers that DACA and DAPA inspired a flood of immigration which led, in turn, to increased crime. His injury rests on the behavior of third parties, undocumented immigrants who chose to commit crime. "[I]t is ordinarily substantially more difficult to establish" standing based on the actions of third parties. *Lujan*, 504 U.S. at 562 (internal quotations omitted). The Sheriff has not met that higher burden. The link between DACA and DAPA— programs designed for non-criminals—and crimes committed by undocumented immigrants is too attenuated and susceptible to intervening factors.[1] *See, e.g.*, *Mideast Sys. &*

---

[1] Of course, in reality, the link may be no more attenuated than that connecting a potential twenty-centimeter rise in sea level with greenhouse gas emissions from new vehicles. *See Massachusetts*, 549 U.S. at 522; *see also* Adler, *supra*, at 1074 n. 91 ("[T]he amount of sea-level rise that constitute[d] Masachusetts's actual, present injury is less than 0.1cm-0.2cm per year, and the amount of projected sea-level rise that could be redressed by regulation of greenhouse gas emissions from new motor vehicles under [EPA's

*China Civil Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("[T]he presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied."). Lacking grounds for special treatment under *Massachusetts*, Sheriff Arpaio has not satisfied the demands of our standing doctrine.

Finally, the central difference between this case and *Massachusetts* may be much more practical in nature: Massachusetts, unlike Sheriff Arpaio, did its homework. The State hired experts and introduced detailed information suggesting a causal relationship between certain gases, atmospheric warming and a rise in sea levels. *See Massachusetts*, 549 U.S. at 521–23. Sheriff Arpaio instead can show potential costs but not causation, owing largely to the difficulty of showing causation in cases dependent on third-party behavior. Without more, his claim cannot survive the scrutiny of our modern, formalistic approach to standing.

\* \* \*

Today's holding puts the consequences of our standing jurisprudence in stark relief. If an elected Sheriff responsible for the security of a county with a population larger than

---

regulatory authority] is even less, as U.S. motor vehicles only represent a fraction of [greenhouse gas] emissions."). Even so, Sheriff Arpaio has not shown that link with the particularity our precedents demand. *See, e.g.*, *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004) (requiring "substantial evidence" in the record "of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress").

twenty-one states[2] cannot bring suit, individual litigants will find it even more difficult to bring similar challenges. But today's decision, however broad it may seem, is actually quite narrow in two respects.

First, our decision holds only that Sheriff Arpaio lacks standing to challenge DACA and DAPA, not that those programs are categorically shielded from suit. Indeed, those programs are currently subject to challenge in a number of other circuits. *See Texas*, 787 F.3d at 747–55 (upholding Texas' standing to challenge DAPA based on the costs of providing drivers licenses to DAPA beneficiaries); *Ariz. DREAM Act Coal. v. Brewer*, No. 15-15307, 2015 WL 300376 (9th Cir. July 17, 2015) (ordering the parties, and inviting the federal government, to file briefs discussing whether DACA violates the separation of powers or the Take Care Clause of the Constitution); *cf. Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (holding Mississippi lacked standing to challenge DACA because the state failed to "submit[] . . . evidence that any DACA eligible immigrants resided in the state" or "produce evidence of costs it would incur if some DACA-approved immigrants came to the state").

Second, today's decision does not take issue with the claim that unlawful immigration carries consequences. Indeed, the Supreme Court has previously made clear that Sheriff Arpaio's home state of Arizona "bears many of the consequences of unlawful immigration." *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012). "Hundreds of thousands of deportable aliens are apprehended in Arizona each year.

---

[2] *Maricopa County Profile*, MARICOPA COUNTY OPEN BOOKS, http://www.maricopa.gov/OpenBooks/profile.aspx (last visited July 28, 2015).

Unauthorized aliens who remain in the State comprise, by one estimate, almost six percent of the population." *Id.* In the county the petitioner is charged with policing, "these aliens are reported to be responsible for a disproportionate share of serious crime." *Id.* Nothing in today's opinion casts doubt on these conditions. The court holds only that these general conditions, without more, do not afford the right to challenge the specific federal deferred action programs at issue.

\* \* \*

Our jurisprudence on standing has many shortcomings. As today's decision demonstrates, standing doctrines often immunize government officials from challenges to allegedly *ultra vires* conduct. To understand how this deferential attitude came to pass, we must briefly consider how the standing doctrine evolved over the decades.

Academic accounts suggest that, from the time of the founding until the early twentieth century, "there was no separate standing doctrine at all." Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 MICH. L. REV. 163, 170 (1992); *accord* JOSEPH VINING, LEGAL IDENTITY: THE COMING OF AGE OF PUBLIC LAW 55 (1978) ("The word '*standing*' . . . does not appear to have been commonly used until the middle of . . . [the twentieth] century."); William A. Fletcher, *The Structure of Standing*, 98 YALE L.J. 221, 224–25 (1988) ("[N]o general doctrine of standing existed."). "In early practice in England and in the United States, moreover, certain forms of action, or writs, were available to all citizens without any showing of a 'personal stake' or an 'injury in fact.'" Alex Hemmer, Note, *Civil Servant Suits*, 124 YALE L.J. 758, 764 (2014). There were limits. Namely, plaintiffs could only proceed based on a cause of action rooted in common law or statute. *See*

Sunstein, *supra*, at 169–70; Fletcher, *supra*, at 224. The absence of a free-standing, self-conscious doctrinal approach left room to challenge the government's failure to meet its obligations. That type of claim, "the public action—an action brought by a private person primarily to vindicate the public interest in the enforcement of public obligations—has long been a feature of our English and American law." Louis L. Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 HARV. L. REV. 255, 302 (1961).

If public actions ever were a feature of our law, that is true no longer. Soon after the turn of the twentieth century, as the administrative state materialized, the Supreme Court began focusing on standing as a critical component of justiciability. *See* Sunstein, *supra*, at 179–81. In a significant 1923 case, the Court dismissed a taxpayer's constitutional challenge to the Maternity Act of 1921, finding the taxpayer's pecuniary interest in the Act to be "minute and indeterminable" and noting this scant interest was "shared with millions of other[]" citizens. *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923). In a sign of things to come, the opinion emphasized the "inconveniences" inherent in permitting challenges to widely shared grievances. *Id.* Emboldened justiciability doctrines along these lines served to "insulate progressive and New Deal legislation" from a variety of challenges. Sunstein, *supra*, at 179.

In the following decades, the standing doctrine secured its footing and coalesced around the three factors we know today: injury in fact, causation and redressability. *See Lujan*, 504 U.S. at 560. But hidden within these factors, and the surrounding case law, is a surprising hostility to suits seeking to redress executive branch wrongdoing. That hostility is encapsulated in the generalized grievance doctrine, which the district court below emphasized in dismissing Sheriff

Arpaio's suit. As the district court described the doctrine, "a plaintiff who seeks to vindicate only the general interest in the proper application of the Constitution and laws does not suffer the type of direct, concrete and tangible harm that confers standing and warrants the exercise of jurisdiction." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 200 (D.D.C. 2014). Separation of powers concerns underlie this approach. "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws)," we are reminded, "is the function of Congress and the Chief Executive." *Lujan*, 504 U.S. at 576.

Today's decision reaches the same conclusion as did the district court—Sheriff Arpaio lacks standing—but wisely rests on grounds other than the generalized grievance doctrine. Our antagonism to so-called generalized grievances, if unbounded, threatens multiple harms. For one thing, this doctrine gives public officials all the wrong incentives. The advice seems to be: "Never steal anything small." Focused acts of wrongdoing against particular persons or classes of persons will probably result in injury in fact, affording standing to challenge public officials. But the larger the injury, and the more widespread the effects, the harder it becomes to show standing.

Moreover, the generalized grievance theory and related principles of contemporary standing doctrine effectively insulate immense swaths of executive action from legal challenge. Our relentless emphasis on the need to show a concrete injury caused by executive action and redressable by judicial relief makes it virtually impossible to challenge many decisions made in the modern regulatory state. Executive branch decisions crafting binding enforcement (or non-enforcement) policies, devoting resources here or there (at taxpayer expense), or creating generally applicable norms

may well escape challenge. *See, e.g.*, Hemmer, *supra*, at 768–69; *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (noting the "general unsuitability for judicial review of agency decisions to refuse enforcement").

Consider this case. The Sheriff's claims on the merits may well raise a constitutionally cogent point. Despite the dazzling spin DHS puts on the DACA and DAPA programs, a categorical suspension of existing law—distinct from the case-by-case deferrals or targeted humanitarian exemptions cited as past precedent—complete with a broad-based work authorization, arguably crosses the line between implementing the law and making it. *See* Zachary S. Price, *Enforcement Discretion and Executive Duty,* 67 VAND. L. REV. 671, 759–61 (2014). And this is true even if the legislature aids and abets the usurpation. *See generally* Department of Homeland Security Appropriations Act of 2010, Pub. L. No. 111-83, 123 Stat. 2142, 2149 (2009); Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, div. F., Tit. II, 128 Stat. 5, 251 (2014) (directing the Secretary of Homeland Security to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime," but silent as to the propriety of categorically suspending existing removal laws). Neither the aggressive entrepreneurship of the executive nor the pusillanimity of the legislative branch can alter the fundamental constraints of the Constitution. *See, e.g.*, Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause,* 91 TEX. L. REV. 781, 850–56 (2013); Price, *supra*, at 759–61. However, although it is the denial of standing rather than its grant that undermines democratic accountability in such circumstances, concerns about the efficacy of separation of powers principles can be

dismissed as "generalized grievances" no one has standing to challenge.

Separation of powers concerns surely cannot justify every application of the generalized grievance doctrine. By prohibiting abstract, general claims, the doctrine aims to ensure that the President's "most important constitutional duty, to 'take Care that the Laws be faithfully executed'" is not transferred to the courts. *Lujan*, 504 U.S. at 577 (quoting U.S. CONST. art. II, § 3). But what if the Chief Executive decides *not* to faithfully execute the laws? In that case our doctrine falls silent. Paying a nominal filing fee guarantees access to the federal courts, but challenge the executive's decision to undermine the rule of law and you will likely find your fee wasted.

This court has previously emphasized the need to approach the standing of challengers to *ultra vires* conduct with a measure of sensitivity. In a 1987 case, we held that a non-profit providing services to Haitian refugees lacked standing, under both constitutional and prudential rubrics, to challenge the executive's policy of interdicting Haitian refugees on the open ocean. *Haitian Refugee Ctr.*, 809 F.2d at 796. After concluding the challengers lacked standing under Article III, the court applied the prudential standing doctrine, which asks whether a plaintiff falls within the zone of interests protected under a particular statutory or Constitutional provision. Some flexibility was in order. The challengers did not have to satisfy the zone of interest test with respect to the

> constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires*. Otherwise, a meritorious litigant, injured by *ultra vires* action, would

seldom have standing to sue since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest.

*Id.* at 811 n.14. While the court's comments centered on prudential standing, they offer a useful reminder that standing doctrines—both constitutional and prudential in nature—should not be construed so narrowly as to choke legitimate challenges to *ultra vires* conduct. Here, the lesson is clear. We should, at the very least, give careful thought before blindly applying the generalized grievance doctrine in cases challenging federal programs as *ultra vires*.

The second shortcoming of our standing doctrine is this: standing has become a "lawyer's game," as Chief Justice Roberts phrased it. *Massachusetts*, 549 U.S. at 548 (Roberts, J., dissenting). Sophisticated, well-resourced litigants can game the system, producing the types of proof that pass muster, while less sophisticated litigants may be left outside the courthouse doors. Our case law hardly provides clear guidance. Sometimes standing appears to rest on mere *ipse dixit*. "A litigant, it seems, will have standing if he is 'deemed' to have the requisite interest, and 'if you . . . have standing then you can be confident you are' suitably interested." *Flast v. Cohen*, 392 U.S. 83, 130 (1968) (Harlan, J., dissenting) (quoting Ernest J. Brown, *Quis Custodiet Ipsos Custodes?—The School-Prayer Cases*, 1963 SUP. CT. REV. 1, 22).

More broadly, our obsession with standing "present[s] courts with an opportunity to avoid the vindication of unpopular rights, or even worse to disguise decision on the merits in the opaque standing terminology of injury, causation, remedial benefit, and separation of powers." 13A

14

CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.3 (3d ed. 1998).

\* \* \*

In the not-so-distant past, Judge (and later Chief Justice) Burger could safely conclude that "experience rather than logic or fixed rules" guided the search for standing. *Office of Commc'n of United Church of Christ v. FCC*, 359 F.2d 994, 1004 (D.C. Cir. 1966) (Burger, J.) (upholding the standing of television viewers to intervene in broadcast license renewal proceedings as "private attorneys general"). Experience and logic no longer reign supreme. In place of "functional" tests "designed to insure [sic] that only those with a genuine and legitimate interest" may come into court, *id.* at 1002, we now employ formalistic tests that may tend to discourage certain constitutional challenges. Today's decision teaches a lesson: litigants bringing constitutional challenges must pay exceptionally close attention to standing requirements. The courts do—especially when litigants do not.

No doubt the modern approach to standing serves to reduce our caseload. But there are much more important matters at stake. "Some [litigants] need bread; others need Shakespeare; others need their rightful place in the national society—what they all need is processors of law who will consider the people's needs more significant than administrative convenience." *Id.* at 1005 (quoting Edmond Cahn, *Law in the Consumer Perspective*, 112 U. PA. L. REV. 1, 13 (1963)). Our approach to standing, I fear, too often stifles constitutional challenges, ultimately elevating the courts' convenience over constitutional efficacy and the needs of our citizenry.