**Jane DOE, Appellant,**

v.

**ST. LOUIS COMMUNITY COLLEGE, Respondent.**

**No. ED 104574**

Missouri Court of Appeals, Eastern District, DIVISION THREE.

Filed: July 11, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied August 22, 2017

Anthony E. Rothert, Jessica M. Steffan, Co-Counsel, 454 Whitter Street, Saint Louis, Mo. 63108, Gillian R. Wilcox, Co-Counsel, 3601 Main Street, Kansas City, Mo. 64111, for appellant.

Ian P. Cooper, 34 N. Meramec Ave, Mollie E. Hennessee, Co-Counsel, Suite 600, Clayton, Mo. 63105, for respondent.

## OPINION

Angela T. Quigless, P.J.

Jane Doe ("Ms. Doe") appeals from a judgment of the Circuit Court of St. Louis County entered in favor of St. Louis Community College ("St. Louis Community College" or "SLCC") denying her petition for a declaratory judgment and injunctive relief, which sought to prevent SLCC from charging her tuition at the international student rate rather than the in-district tuition rate. Ms. Doe argues the trial court erred in interpreting 6 C.S.R. § 10-3.010(7) (2015)[1] as excluding her from establishing in-state residency for purposes of calculating her tuition rate. We affirm the judgment.

### Factual and Procedural Background

At all times relevant to this case, Ms. Doe has lived in St. Louis County, Missouri, within the St. Louis Community College District. Ms. Doe is neither a citizen of the United States nor does she possess any lawful immigration status. She was brought to the United States as a child, and has lived in Missouri continuously for the past ten years.

In 2012, Ms. Doe applied for and was granted "deferred action" through a federal program called Deferred Action for Childhood Arrivals ("DACA"). This program is administered by the Department of Homeland Security ("DHS"), an administrative agency of the executive branch of the federal government. Deferred action grants individuals who are not lawfully present in the United States a formal reprieve from the risk of being removed from the country. So long as her DACA approval remains valid, Ms. Doe is not subject to removal from the United States and she is authorized to work. However, DACA confers no substantive right, immigration status or pathway to citizenship on recipients and is revocable at any time at the sole discretion of DHS.

SLCC is a Missouri state-funded community college, which charges different tuition rates to students depending on their residency status. For the fall 2015 semester, in-district students, those residing within the SLCC District, were charged $103 per credit hour to attend the college. Missouri residents residing outside the SLCC District were charged $149 per credit hour. Out-of-state residents were charged $205 per credit hour. International students were charged $215 per credit hour.

For the purpose of calculating tuition rates, residency status is determined by 6 C.S.R. § 10-3.010 ("Student Residency Regulation" or the "Regulation"), a state regulation promulgated by the Coordinating Board for Higher Education. The Student Residency Regulation states:

In determining resident status for the state of Missouri, either of the following shall be sufficient *proof of domicile* of a person and his/her unemancipated minor or dependent children within the state of Missouri:

1. Presence within the state of Missouri for a minimum of the twelve (12) immediate past, consecutive months coupled with proof of intent to make the state of Missouri a permanent home for an indefinite period; or

2. Presence within the state of Missouri for the purpose of retirement, full-time employment, full-time professional practice, or to conduct a business full-time coupled with proof of intent to make the state of Missouri a permanent home for an indefinite period.

---

1. All regulatory references are to 6 C.S.R. § 10-3.010 (2015), unless otherwise indicated.

6 C.S.R. § 10-3.010(9)(C) ("General Residency Requirements") (emphasis added). The Regulation also imposes additional requirements, which students who are not citizens of the United States must satisfy prior to consideration for the in-state or in-district tuition rate, stating:

(A) Students who are not citizens of the United States must possess *resident alien status, as determined by federal authority,* prior to consideration for resident status.

(B) Aliens present within Missouri as representatives of a foreign government or at the convenience of the United States or Missouri governments and holding G visas shall be entitled to resident status, except for those who are government-funded students.

(C) Aliens and their dependents holding A or L visas may be granted resident status if determined to be individually designated as representatives of their governments and whose education is not government-funded.

6 C.S.R. § 10-3.010(7) ("Noncitizen Residency Requirements") (emphasis added).

The parties agreed to submit the case based on stipulated facts. The parties stipulated that "[p]rior to May 8, 2015, any student who could establish residency in the [SLCC] District, in accordance with 6 C.S.R § 10-3.010, was eligible for the rate charged to District residents." [2] On May 8, 2015, House Bill 3 was signed into law. H.B. 3, 98th Gen. Assemb., 1st Reg. Sess. (Mo. 2015) ("House Bill 3"). House Bill 3 is an appropriations bill funding the Department of Higher Education and other related programs and agencies, including SLCC. The preamble to House Bill 3 states "no funds shall be expended at public institutions of higher education that offer a tuition rate to any student with an unlawful immigration status in the United States that is less than the tuition rate charged to international students." *Id.*

In 2015, Ms. Doe enrolled in classes at SLCC for the fall semester. She paid her initial tuition deposit in July and was expecting to receive the in-district tuition rate of $103 per credit hour. However, a few weeks later she received a tuition bill charging the international student rate of $215 per credit hour.

Ms. Doe filed a petition against SLCC, seeking a declaratory judgment that she possesses "resident alien status" and an injunction prohibiting SLCC from charging her the international student rate. In her trial brief, Ms. Doe argued " '[r]esident alien status' is a term used only by a single federal authority: the Internal Revenue Service" and that under the Internal Revenue Code, she qualifies as a "resident alien." SLCC argued that federal tax law was irrelevant, that the only relevant federal authority is federal immigration law, and that Ms. Doe's DACA approval does not qualify as "resident alien status" under immigration law. SLCC also argued that the legislative intent of 6 C.S.R. § 10-3.010(7) should be interpreted in light of the preamble to House Bill 3, which states individuals with an unlawful immigration status, such as Ms. Doe, should be charged the international student tuition rate.

The trial court denied the petition for declaratory judgment and injunctive relief, and entered judgment in favor of SLCC. In its judgment, the court concluded that 6 C.S.R. § 10-3.010(7) was ambiguous, and interpreted the phrase "resident alien status, as determined by federal authority" to mean only individuals with *lawful perma-*

---

**2.** This is the only stipulated fact in the record concerning SLCC's application of 6 C.S.R § 10-3.010 or how it was affected by the preamble to House Bill 3.

*nent* resident ("LPR")[3] status, as determined by federal *immigration* authority. The court also partially relied on the preamble to House Bill 3 to guide its interpretation of the Regulation. The court further concluded Ms. Doe did not possess "resident alien status" as required by 6 C.S.R. § 10-3.010(7) because DACA does not qualify as LPR status under federal immigration law. This appeal follows.

## Points on Appeal

Ms. Doe raises three points on appeal. In Point I, Ms. Doe argues the trial court erred in relying on the preamble language of House Bill 3, a state appropriations bill, to support its finding that she is required to pay tuition at the international student rate because the language in this preamble is neither binding nor enforceable, and cannot be used to qualify an unrelated state regulation. In Point II, Ms. Doe argues the trial court erred in concluding that the phrase "resident alien status, as determined by federal authority" in 6 C.S.R. § 10-3.010 is ambiguous and refers only to persons who possess LPR status, commonly referred to as a "green card." In Point III, Ms. Doe argues that, even if 6 C.S.R. § 10-3.010 is ambiguous, the trial court erred in interpreting the phrase "resident alien status, as determined by federal authority" to mean only persons who possess LPR status because this interpretation injected a "potential constitutional infirmity" into the Regulation, which this Court has an obligation to avoid.

## Standard of Review

Our standard of review is governed by *Murphy v. Carron* when reviewing the trial court's judgment in a bench-

tried case. *Pearson v. Koster*, 367 S.W.3d 36, 43 (Mo. banc 2012) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). Under this standard of review, this Court will affirm the judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Pearson*, 367 S.W.3d at 43. This court will affirm the judgment on different grounds if the trial court reached the correct result but for the wrong reason. *Kubley*, 141 S.W.3d at 27 n.5 ("Although the trial court reached this result on a different ground, we will affirm where it reached the right result, even if for the wrong reason."). "It is not necessary that we agree with the trial court's basis for the judgment.... If the judgment is properly sustainable on other grounds, the judgment must be affirmed." *Hulse v. Warren*, 777 S.W.2d 319, 322 (Mo. App. S.D. 1989).

The application of this standard of review varies depending on the burden of proof applicable at trial and the type of error claimed on appeal. *Pearson*, 367 S.W.3d at 43. A claim that the judgment erroneously declares or applies the law involves review of the trial court's construction and application of the law. *Id.* The interpretation of a law, such as a regulation, is a question of law, which this court reviews *de novo*. *Gallagher v. Dir. of Revenue*, 487 S.W.3d 24, 27 (Mo. App. E.D. 2016). Where, as in this case, "a court-tried case is submitted on stipulated facts, however, then the only question before the Court is whether the trial court drew the proper legal conclusions from the facts stipulated," which is also a question of law this court reviews *de novo*. *Junior Coll. Dist. v. City of St. Louis*, 149 S.W.3d 442,

---

**3.** "Lawful permanent residency" and "lawful permanent residents" are commonly referred to as a "green card" and "green card holders," respectively. "Lawful permanent residency" is shorthand for an alien "lawfully admitted for permanent residence," which is a specific type of immigration status under federal law. *See* 8 U.S.C. § 1101(a)(20).

446 (Mo. banc 2004) (citations and quotations omitted).

## Discussion

Although Ms. Doe articulates three separate points on appeal, the essential issue raised in each is whether the trial court properly interpreted the phrase "resident alien status, as determined by federal authority" in 6 C.S.R. 10-3.010(7) as meaning only aliens with LPR status under federal immigration law. Although we find Ms. Doe does not possess "resident alien status," we disagree with the trial court's interpretation of "resident alien status" as meaning only individuals with LPR status. However, because the court reached the correct result, we affirm the judgment. *See Kubley v. Brooks*, 141 S.W.3d 21, 27 n.5 (Mo. banc 2004).

It is undisputed that Ms. Doe met the General Residency Requirements contained in 6 C.S.R. § 10-3.010(9)(C) because she resided in Missouri, and within the SLCC District, continuously for ten years prior to enrolling in classes at SLCC, which is more than the twelve months required under the Regulation's General Residency Requirements. It is also undisputed that Ms. Doe is not a citizen of the United States, making the additional Noncitizen Residency Requirements in 6 C.S.R. § 10-3.010(7) applicable to her. The only question is whether Ms. Doe possesses "resident alien status, as determined by federal authority" under 6 C.S.R. § 10-3.010(7), which is a prerequisite that must be met "prior to consideration for resident status" under 6 C.S.R. § 10-3.010(9)(C). To resolve this issue, we must interpret the meaning of the Student Residency Regulation as applied to Ms. Doe.

Administrative regulations are interpreted under the same principles of construction as statutes. *Gallagher*, 487 S.W.3d at 27. Our goal is to ascertain the agency's intent and give effect thereto by considering the plain meaning of the words used in the regulation. *Id.* Where the language of a statute is unambiguous, there is nothing to construe and we will give effect to the language as written without resorting to rules of statutory construction. *Brady v. Curators of the Univ. of Mo.*, 213 S.W.3d 101, 107 (Mo. App. E.D. 2006). Only in those cases "[w]here the language of the statute is ambiguous or where its plain meaning would lead to an illogical result, will this court look past the plain and ordinary meaning of a statute." *Anderson v. Ken Kauffman & Sons Excavating, L.L.C.*, 248 S.W.3d 101, 106 (Mo. App. W.D. 2008) (internal quotations and citations omitted).

A statute or regulation is ambiguous when the legislative intent cannot be determined from the plain meaning of the language. *United Pharmacal Co. of Mo., Inc. v. Mo. Bd. of Pharm.*, 208 S.W.3d 907, 909-10 (Mo. banc 2006). The standard is whether the meaning of the statute is plain and clear to one of ordinary intelligence. *Wolff Shoe Co. v. Dir. of Revenue*, 762 S.W.2d 29, 31 (Mo. banc 1988). When a statute is ambiguous, this Court turns to principles of statutory construction to resolve any ambiguity. *United Pharmacal*, 208 S.W.3d at 909-10.

Under the principles of statutory construction, courts should first consider the ambiguous language in the context of "the other words listed in a statutory provision to help it discern which of multiple possible meanings the legislature intended." *Union Elec. Co. v. Dir. of Revenue*, 425 S.W.3d 118, 122 (Mo. banc 2014); *Dep't of Soc. Servs. v. Senior Citizens Nursing Home Dist.*, 224 S.W.3d 1, 9 (Mo. App. W.D. 2007) ("Context determines meaning.") (citing *Keller v. Marion Cnt'y Ambulance Dist.*,

820 S.W.2d 301, 302 (Mo. banc 1991)). This principle is known by the maxim *noscitur a sociis*—a word is known by the company it keeps. *Union Elec. Co.*, 425 S.W.3d at 122. Second, the court should read one provision of a statute in harmony with the entire section. *Gott v. Dir. of Revenue*, 5 S.W.3d 155, 159-60 (Mo. banc 1999) ("The provisions of a legislative act are not to be read in isolation, but are to be construed together and read in harmony with the entire act."). Third, if the statutory language is unclear from consideration of the statute alone, a court "should interpret the meaning of the statute *in pari materia* with other statutes dealing with the same or similar subject matter." *Union Elec. Co.*, 425 S.W.3d at 122. Finally, courts may turn to legislative history to review the earlier versions of the law, examine the whole act to discern its evident purpose, or consider the problem that the statute was enacted to remedy. *United Pharmacal*, 208 S.W.3d at 911-12. In construing the meaning of an ambiguous enactment, a court should only adopt reasonable interpretations, disregarding constructions that would lead to absurd results. *Senior Citizens Nursing Home Dist.*, 224 S.W.3d at 9.

### A) The phrase "resident alien status, as determined by federal authority" is ambiguous

We find that the language of 6 C.S.R. § 10-3.010(7) contains two ambiguities. First, the phrase "as determined by federal authority" is ambiguous because the plain language of the Regulation does not make clear what federal authority it is referring to. *United Pharmacal*, 208 S.W.3d at 911 (finding a statute ambiguous where the legislative intent on the issue could not be discerned from the plain language of the statute itself). Second, the phrase "resident alien status" is ambiguous because it is not defined anywhere in 6 C.S.R. § 10-3.010, and the Regulation specifically says to look to another source, "federal authority," for the definition. Both of these phrases are ambiguous because neither meaning is "plain and clear to one of ordinary intelligence." *Wolff Shoe Co.*, 762 S.W.2d at 31. Therefore, this Court must refer to the principles of statutory construction to interpret these phrases as applied to Ms. Doe and clarify the ambiguities they have created in her case.

### B) The "federal authority" referred to in 6 C.S.R. § 10-3.010(7) is immigration law

Using the rules of statutory construction, we first consider the ambiguous phrase "as determined by federal authority" in the context of other words in the same section to see if the context clarifies its meaning. *Union Elec. Co.*, 425 S.W.3d at 122. Given the other language in the Noncitizen Residency Requirements in 6 C.S.R. § 10-3.010(7), it is reasonable to interpret that, when the Commission said "as determined by federal authority," it was referring only to federal authority that is relevant given the context. *Senior Citizens Nursing Home Dist.*, 224 S.W.3d at 9 ("Context determines meaning."). We find the Regulation contains express references to immigration law within the same section. Notably, the sentence containing this phrase also contains the word "alien," which is a federal classification under immigration law meaning "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). In addition, the related provisions in subsections (7)(B) and (7)(C) specifically refer to "visas," which are federal immigration documents. Moreover, previous versions of 6 C.S.R. § 10-3.010(7) combined all three subsections into a single paragraph, where the phrase "resident alien status" immediately pre-

ceded the sentences discussing visas. *See* 6 C.S.R. § 10-3.010(6) (2008) (prior section number for the Noncitizen Residency Requirements). Thus, the context in which the phrase "as determined by federal authority" is used in this section of the Student Residency Regulation clearly refers to federal *immigration* law.

Here, the numerous references to immigration law make it apparent that the federal authority referred to by the Commission is federal immigration law. *See Borden Co. v. Thomason*, 353 S.W.2d 735, 754 (Mo. banc 1962) (rejecting an interpretation of a statutory term that would require removing the term from its context). The meaning of the phrase "as determined by federal authority" is clarified after reading these words in context with other words in the same section of the Student Residency Regulation. Therefore, we need look no further by referring to other sections of the Regulation, reading the Regulation *in pari materia* with other related legislative materials, or examining legislative history to determine the intent of the legislature. *See Union Elec. Co.*, 425 S.W.3d at 122.

### C) DACA is not a "resident alien status" under federal immigration law

██ While we have determined the phrase "resident alien status, as determined by federal authority" refers to federal immigration authority, this does not clarify the meaning of "resident alien status." Unfortunately, this phrase is not specifically defined in any of the federal immi-

gration statutes.[4] However, deciding this case does not require us to provide a comprehensive meaning of the term. Rather, we must only determine whether this phrase applies to Ms. Doe under the circumstances of this case. We find that it does not.

On June 15, 2012, the Secretary of the Department of Homeland Security, Janet Napolitano, issued a memorandum directing the nation's immigration authorities to exercise prosecutorial discretion to limit the removal of certain immigrants without any immigration status who were brought to the United States illegally when they were children. Memorandum from Janet Napolitano, Sec'y of U.S. Dep't of Homeland Sec, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012) ("*DACA Memo*"). This memorandum created the federal executive branch program know as "Deferred Action for Childhood Arrivals," commonly referred to as "DACA."

Through DACA, immigration officials may exercise their prosecutorial discretion to grant deferred action to individuals who meet certain criteria for a renewable two-year period, and may also grant these individuals authorization to work in the United States. *DACA Memo.* Deferred action grants individuals who are not lawfully present in the United States a formal reprieve from the risk of being removed from the country. *Id.*; *See Arpaio v. Obama*, 797 F.3d 11, 17 (D.C. Cir. 2015). Although DACA approval is generally grant-

---

4. The trial court noted the lack of a definition of "resident alien status" in federal immigration statutes. However, the court identified numerous portions of the statutes, cases, and administrative agency decisions, applying the statutes, which use some form of the term "resident alien" as shorthand to refer to "lawful permanent resident." *See, e.g.*, 8 U.S.C. § 1257; *Vartelas v. Holder*, 566 U.S. 257, 265,

132 S.Ct. 1479, 182 L.Ed.2d 473 (2012); *Matter of Gordon*, 17 I.&N. Dec. 389, 391 (BIA 1980) (administrative agency). "Lawful permanent resident" is itself a term of art that refers to an alien "lawfully admitted for permanent residence," which is defined under federal immigration law. *See* 8 U.S.C. § 1101(a)(20).

ed for a set period of time expiring after either two or three years, DHS may revoke an individual's DACA approval at any time and at its sole discretion. *See Texas v. U.S.*, 809 F.3d 134, 203 n.33 (5th Cir. 2015) ("[D]eferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion.").

Under the guidelines implementing DACA issued by DHS, individuals may be considered for deferred action if they meet the following criteria:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Entered without inspection before June 15, 2012, or your lawful immigration status expired as of June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

U.S. Dep't of Homeland Security, "Deferred Action for Childhood Arrivals," https://www.dhs.gov/deferred-action-child hood-arrivals (July 17, 2015) ("*DACA Guidelines*").

In this case, it is undisputed that Ms. Doe had no immigration status prior to receiving DACA in 2012. The DACA program is only available to aliens who have no immigration status. *DACA Guidelines.* It is equally clear that DACA, by its own terms, "confers no substantive right, immigration status or pathway to citizenship" on recipients. *DACA Memo*; see *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058-59 (9th Cir. 2014) ("Like recipients of other forms of deferred action, DACA recipients enjoy no formal immigration status."). Moreover, Ms. Doe conceded at oral arguments that DACA provides her with no immigration status, and is therefore insufficient to qualify as "resident alien status" under federal immigration law. While DACA does grant Ms. Doe a reprieve from the risk of removal for a limited period of time as well as temporary authorization to work, these benefits are subject to complete revocation at the sole discretion of DHS. *Arpaio*, 797 F.3d at 17 ("[D]eferred action remains discretionary and reversible."). Therefore, it is not possible for Ms. Doe to have any immigration status at all because she had none when she applied for DACA, and DACA did not confer any upon her.

The *DACA Memo* recognizes that "[o]nly the Congress, acting through its legislative authority, can confer these rights." *DACA Memo.* If DHS, a federal executive agency, had the power to create a new immigration status and confer it upon any individuals it desired, this would be an unconstitutional end-run around the principle of separation of powers. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). As the memo itself acknowledges, only the legislature has power or authority to enact legislation, which would be required to create a new type of immigration status. *See id.* at 589, 72 S.Ct. 863 ("The Founders of this Nation entrusted

the lawmaking power to the Congress alone . . . .").

For the foregoing reasons, we find that Ms. Doe does not possess any immigration "status" that could possibly qualify as a "resident alien status, as determined by federal authority" under 6 C.S.R. § 10-3.010(7).[5] Therefore, the trial court did not err in concluding, under the Noncitizen Residency Requirements of the Student Residency Regulation, Ms. Doe was not entitled to the in-district tuition rate at SLCC.[6] In reaching this conclusion, we make no effort to offer a comprehensive definition of this phrase because one is not required to resolve this case.

### D) Neither the Internal Revenue Code nor the preamble to House Bill 3 are relevant to the interpretation of 6 C.S.R. § 10-3.010(7)

The parties each argue that this Court should utilize the doctrine of *in pari materia* and consider extraneous legislative sources to interpret the meaning of 6 C.S.R. § 10-3.010(7), specifically the definition of "resident alien" under the Internal Revenue Code, 26 U.S.C. § 7701(b)(1)(A), and the preamble to House Bill 3, a Missouri state appropriations bill. The doctrine of *in pari materia* is a principle of construction that "pro-

ceeds upon the supposition that the statutes in question are intended to be read consistently and harmoniously in their several parts and provisions." *State ex rel. Rothermich v. Gallagher*, 816 S.W.2d 194, 200 (Mo. banc 1991). Statutes *in pari materia* "are construed together as though constituting one act, whether adopted at different dates or separated by long or short intervals." *Id.*

Ms. Doe argues that the federal Internal Revenue Code ("IRC") is instructive because it is the only federal authority that offers a specific definition of the phrase "resident alien" used without any preceding adjective modifying the phrase, such as "lawful" or "permanent." *See* 26 U.S.C. § 7701(b)(1)(A).[7] We find this argument unpersuasive for three reasons: it takes the phrase out of its context, it would render the Noncitizen Residency Requirements mere surplusage, and it would lead to absurd results.

Under the IRC, an alien can claim "resident alien" status on their federal income tax returns so long as they meet the following criteria:

> For purposes of this title[8] . . . . An alien individual shall be treated as a resident of the United States with respect to any calendar year if (and only if) such indi-

---

5. We do not dispute that DACA, and executive orders more generally, are a source of federal authority. We also do not dispute that the authority to grant deferred action has a statutory basis in the authority granted to the executive branch by Congress in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq.* We merely find that DACA does not confer any type of immigration status that could qualify as "resident alien status," since that is precisely what the *DACA Memo* itself states.

6. We acknowledge the trial court's judgment reached this same conclusion by interpreting "resident alien status" to mean only "lawful permanent residents." While we reject this

reasoning, as explained below, "we will affirm where [the court] reached the right result, even if for the wrong reason." *Kubley*, 141 S.W.3d at 27 n.5.

7. All references to the IRC are to 26 U.S.C. § 7701 (2015).

8. It appears this section of the IRC was never intended to be used outside of the context of federal revenue laws. The definition itself specifically states that the definition of "resident alien" is intended for the purpose of Title 26, thus limiting the use of this definition to the context of the IRC itself. 26 U.S.C. § 7701(b)(1).

vidual meets the requirements of clause (i), (ii), or (iii):

(i) Lawfully admitted for permanent residence. Such individual is a lawful permanent resident of the United States at any time during such calendar year.

(ii) Substantial presence test. Such individual meets the substantial presence test of paragraph (3).

(iii) First year election. Such individual makes the election provided in paragraph (4).

26 U.S.C. § 7701(b)(1)(A). Under the "substantial presence test" in subsection (ii), an individual generally meets the criteria of "resident alien" and may claim this status on their federal income taxes if they were present in the United States for at least thirty-one days during the calendar year in which they are claiming the status, and were present in the United States for at least 183 days total during the three-year period ending in the current year. *See* 26 U.S.C. § 7701(b)(3)(A). Under the "first year election" in subsection (iii), individuals have the option to claim "resident alien" status on their federal income taxes so long as they have been present in the United States for at least seventy-five percent of the days within a consecutive thirty-one day period during the election year, and will satisfy the "substantial presence test" in the following year. *See* 26 U.S.C. § 7701(b)(4)(A).

First, we note nothing in the language of 6 C.S.R. § 10-3.010(7) refers in any way to the IRC or federal income tax law. *See Borden Co.*, 353 S.W.2d at 754 (rejecting appellant's proposed interpretation of a statutory term because it "would remove the mentioned term from the context in which it is used in the several [statutory] sections"). Rather, the only references to any specific federal authority in the Regulation are to various types of "visas," which are part of federal immigration law. Thus, Ms. Doe's argument would require us to disregard the first principle of statutory construction, which is that ambiguous terms must be interpreted in the context of the other language used in the Regulation itself. *See Senior Citizens Nursing Home Dist.*, 224 S.W.3d at 9 ("Context determines meaning.") (citing *Keller*, 820 S.W.2d at 302).

Second, if we interpreted 6 C.S.R. § 10-3.010(7) as referring to the IRC to determine the meaning of "resident alien status," the Noncitizen Residency Requirements would become meaningless. Every individual who meets the General Residency Requirements of 6 C.S.R. § 10-3.010(9) also necessarily meets the criteria under the IRC for claiming they are a "resident alien" on their federal income taxes. Missouri's General Residency Requirements that apply to all individuals, not just noncitizens, already require individuals to be present "within the state of Missouri for a minimum of the twelve (12) immediate past, consecutive months," 6 C.S.R. § 10-3.010(9)(C), which is always sufficient to meet the much less demanding requirements for "alien resident" status provided in the IRC. Moreover, under the "first year election," individuals can essentially decide to declare themselves a "resident alien" so long as they have been present in the United States for seventy-five percent of the days in a consecutive thirty-one day period, which equates to a mere twenty-four days. *See* 26 U.S.C. § 7701(b)(4)(A). Any individual who has resided in Missouri consecutively for the last twelve months is *de facto* a "resident alien" under the IRC. *See* 26 U.S.C. §§ 7701(b)(1)(A), 7701(b)(3)(A), and 7701(b)(4)(A). Thus, Ms. Doe's interpretation relying on the IRC's definition of "resident alien" renders meaningless the additional Noncitizen Residency Requirements contained in 6 C.S.R. § 10-3.010(7). Since this interpretation

would render an entire section of the Student Residency Regulation "mere surplusage" we must reject it. *Cook v. Newman*, 142 S.W.3d 880, 889 (Mo. App. W.D. 2004) (courts reject interpretations that render statutory language "mere surplusage" because "[p]resumably, the legislature does not insert superfluous language in a statute").

Finally, interpreting the phrase "resident alien status" as referring to the definition of "resident alien" in the IRC would lead to absurd results. If a student could use the IRC's "first year election" option to simply declare themselves as "resident alien" after residing in the United States for a mere twenty-four days in any consecutive thirty-one day period, this would allow noncitizen students with international student visas to get around paying the international student rate by simply declaring resident alien status on their federal tax returns so long as they met the less stringent General Residency Requirements applicable to citizens. Thus, Ms. Doe's interpretation relying on the IRC would allow international student visa holders to pay the in-district tuition rate, rather than the international student tuition rate. We decline to interpret this Regulation in a way that would lead to such an absurd result. *See Senior Citizens Nursing Home Dist.*, 224 S.W.3d at 9. Therefore, we find the definition of "resident alien" under federal tax law is irrelevant to determining the meaning of the phrase "resident alien status, as determined by federal authority" as used in 6 C.S.R. § 10-3.010(7).

 SLCC argues the preamble to House Bill 3, an appropriations bill, should be read *in pari materia* with the Noncitizen Residency Requirements in 6 C.S.R. § 10-3.010(7) because the preamble provides a clear indication that the legislature intended the Noncitizen Residency Re-

quirements to require individuals with unlawful immigration status, such as Ms. Doe, to pay tuition at the international student rate. *See* H.B. 3, 98th Gen. Assemb., 1st Reg. Sess. (Mo. 2015). Where a statute or regulation is ambiguous, courts may look to the enactment's preamble to ascertain the meaning of the language in that enactment. *Doemker v. Richmond Heights*, 322 Mo. 1024, 18 S.W.2d 394, 398 (1929). Courts may also look to the language used in related enactments *in pari materia. State ex rel. Rothermich*, 816 S.W.2d at 200. However, there is no precedent for using the preamble of a legislative enactment to clarify the meaning of a completely different Regulation, especially where, as in this case, the law containing the preamble was enacted after the Regulation it purports to clarify.

In every instance where a Missouri court has contemplated using a preamble to determine the meaning of an ambiguous statute or other enactment, the court was referring to the preamble of the ambiguous enactment itself, not some other preamble. *See, e.g., State ex rel. May Dep't Stores Co. v. Koupal*, 835 S.W.2d 318, 320 (Mo. banc 1992); *Doemker*, 18 S.W.2d at 398; *Lackland v. Walker*, 151 Mo. 210, 52 S.W. 414, 430 (1899); *Strong v. Am. Cyanamid Co.*, 261 S.W.3d 493, 508 (Mo. App. E.D. 2007); *Lett v. City of St. Louis*, 948 S.W.2d 614, 616-17 (Mo. App. E.D. 1996); *see also In re Hess*, 406 S.W.3d 37, 44 (Mo. banc 2013) (preamble to the Missouri Rules of Professional Conduct); *Joplin v. Joplin Water Works Co.*, 386 S.W.2d 369, 375 (Mo. 1965) (preamble to a local ordinance); *City of Clinton v. Terra Found., Inc.*, 139 S.W.3d 186, 193 (Mo. App. W.D. 2004) (preamble to a zoning ordinance).

We find the preamble to House Bill 3 is not relevant to interpreting 6 C.S.R. § 10-3.010(7) because these laws are not *in pari materia. State ex rel. Rothermich*, 816

S.W.2d at 200. ("Statutes are in pari materia when they relate to the same matter or subject."). There is no indication that a regulation governing the residency status of students and state-funded institutions of higher education concerns the same subject matter as a bill appropriating funds to those institutions. *See id.* The former governs applicable tuition rates students must pay while the latter merely provides money to fund the schools' operations.

Moreover, the Student Residency Regulation was promulgated by the Coordinating Board for Higher Education while House Bill 3 was passed by the General Assembly. A preamble to a legislative enactment may be used to clarify the legislative intent of an ambiguous provision in that enactment. *Doemker,* 18 S.W.2d at 398. However, the Coordinating Board for Higher Education and the General Assembly are completely distinct legislative bodies, which may have had differing legislative intents. There is no reason to believe that the intent of an administrative agency while promulgating this Regulation would be the same as the intent of the legislature when enacting an appropriations bill.

Therefore, we find neither the IRC nor the preamble to House Bill 3 are instructive for determining the meaning of "resident alien status, as determined by federal authority" under 6 C.S.R. § 10-3.010(7).

### E) *"Resident alien status" is not limited to Lawful Permanent Resident status*

Insofar as the trial court's decision defined the phrase "resident alien status, as determined by federal authority" to mean *only* individuals with "lawful permanent resident status," we disagree. *Hulse,*

777 S.W.2d at 322 (appellate court may affirm a judgment on different grounds than trial court). The trial court's interpretation reads into the Noncitizen Residency Requirements two words that were not present, "lawful" and "permanent." It is not clear that these words were intended to be included in the text of the Regulation but inadvertently omitted. *See In re Bloemker,* 766 S.W.2d 687, 689 (Mo. App. E.D. 1989) ("We are not to supply, insert or read words into a statute unless there is an omission plainly indicated").

Under federal immigration law, there are dozens of types of immigration status available to noncitizens.[9] Some types of immigration status are limited to "immigrants," meaning aliens who are authorized to establish domicile in the United States. *See* 8 U.S.C. § 1153.[10] Other types of immigration status are available to "nonimmigrants," meaning aliens who are authorized to reside in the United States for a limited purpose but are precluded from establishing domicile here. *See* 8 U.S.C. § 1101(a)(15). There are also types of immigration status available to individuals who are in the process of adjusting their status from nonimmigrant to immigrant. *See* 8 U.S.C. § 1255. Each of these different types of immigration status provide some form of immigration benefit, such as authorization to work or study in the United States. However, only a subset includes LPR status. *See* 8 U.S.C. § 1101(a)(20).

LPR is the term used to refer to an individual who has been "lawfully admitted for permanent residence," which is defined as "the status of having been lawfully accorded the privilege of residing perma-

---

**9.** For a complete list of the types of immigrant and nonimmigrant visas available, *see* U.S. Dep't of State, *Directory of Visa Categories* (available online at https://travel.state.gov/

content/visas/en/general/all-visa-categories.html).

**10.** *See infra,* note 11.

nently in the United States as an immigrant." 8 U.S.C. § 1101(a)(20). An LPR, as opposed to individuals with any other types of visa or immigration status, has the right to live and work permanently in the United States, to come and go from the country freely without seeking an entrance visa, to own property, to serve in the military, and to become a United States citizen, as well as numerous other rights and immigration protections. U.S. Customs and Immigration Services, "Rights and Responsibilities of a Green Card Holder (Permanent Resident)," https://www.uscis.gov/green-card/after-green-card-granted/rights-and-resp onsibilities-permanent-resident/rights-and-responsibilities-green-card-holder-permanent-resident (Feb. 10, 2017).

By interpreting "resident alien status" to mean *only* LPR status, the trial court's interpretation would exclude numerous categories of aliens who are lawfully residing in the United States, but are not LPRs, from qualifying for in-state tuition at state-funded colleges in Missouri. The trial court's interpretation of 6 C.S.R. 10-3.010 deviates from the default federal classification of aliens who are entitled to state benefits under 8 U.S.C. § 1621(a) (1996), and excludes numerous categories of aliens to whom this State has the au-

thority to grants benefits under 8 U.S.C. § 1621(d).[11]

Although the trial court's interpretation limited the meaning of "resident alien status" to *only* individuals with LPR status, we affirm because the court reached the correct result in concluding that Ms. Doe's DACA status does not qualify as "resident alien status" under federal immigration law. *See Hulse*, 777 S.W.2d at 322. We find that 6 C.S.R. § 10-3.010(7) requires noncitizens to possess some form of "resident alien status, as determined by federal authority" referring to federal immigration law, and that DACA does not qualify. However, because there is no evidence in this case concerning any other type of immigration status, it would be imprudent to decide how the Noncitizen Residency Requirements should apply in those other contexts. Therefore, our holding is limited to the stipulated facts of this case alone, and expresses no opinion as to what other types of immigration status meet this definition.

### F) 6 C.S.R. § 10-3.010(7) does not violate either the Equal Protection Clause or the Supremacy Clause of the United States Constitution

 Ms. Doe argues that "[r]estricting the interpretation of 6 C.S.R. § 10-3.010 to exclude [Ms.] Doe would pose an unneces-

11. Under 8 U.S.C. § 1621(a), aliens eligible for state benefits, include the following categories of aliens: (1) lawful permanent residents; (2) aliens granted asylum under 8 U.S.C. § 1158; (3) refugees admitted under 8 U.S.C. § 1157; (4) aliens "paroled" into the United States under 8 U.S.C. § 1182(d)(5); aliens whose deportation has been withheld under 8 U.S.C. § 1251(b)(3); an alien who is granted conditional entry under to 8 U.S.C. 1153(a)(7); certain Cuban and Haitians defined in 8 USC § 1522; certain battered and abused aliens or their spouses and children. *See* 8 U.S.C. § 1641. Under 8 U.S.C. § 1621(d), States are authorized to enact laws deviating from this federal classification and providing state benefits for certain aliens otherwise ineligible under federal law. However, neither party has cited this federal statute or argued that it is applicable to this case, either in the trial court or on appeal. Accordingly, we do not address the applicability of 8 U.S.C. § 1621 or any related provisions of federal law. Moreover, 8 U.S.C. § 1621 is not directly at issue in this appeal because Ms. Doe is not arguing that her DACA approval is the basis of her alleged right to in-state tuition at SLCC, and we express no opinion as to how 8 U.S.C. § 1621 applies in the context of aliens who have been granted deferred action under DACA.

sary constitutional problem that this court has an obligation to avoid," and that adopting Ms. Doe's interpretation of the Regulation based on the internal revenue code avoids injecting "a close constitutional question" concerning whether the Regulation is preempted by federal immigration law or violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

█ We acknowledge that this Court has a duty to interpret the Regulation in a way that does not violate the Constitution if such an interpretation is plausible. *McPherson v. U.S. Physicians Mut. Risk Retention Grp.*, 99 S.W.3d 462, 484 (Mo. App. W.D. 2003). However, our holding does not create an unconstitutional interpretation of 6 C.S.R. § 10-3.010(7). Although we have not offered a comprehensive definition of the phrase "resident alien status, as determined by federal authority," one plausible interpretation would be that the phrase refers to "immigrant" status under the Immigration and Nationality Act ("INA"). Such an interpretation would be consistent with our holding and would not raise any issues with either equal protection or federal preemption because it would mirror a preexisting federal immigration classification, and distinguish DACA recipients, such as Ms. Doe, from dissimilarly-situated individuals holding a valid "immigrant" status in a relevant way that is wholly consistent with federal immigration policy.

█ "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting U.S. Const. amend. XIV, § 1). Thus, the first step in an equal protection case is determining whether the party claiming a violation of the Equal Protection Clause has demonstrated that he or she was treated differently than others who were similarly-situated in all relevant respects. *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994).

However, individuals with an "immigrant" status are not similarly-situated to individuals who either possess a "nonimmigrant" status or possess no immigration status at all, such as Ms. Doe. Federal immigration law recognizes a fundamental distinction between "immigrants" and "nonimmigrants," the difference being that "immigrants" are permitted to establish *domicile* in the United States while "nonimmigrants" are generally precluded from doing so. *See Toll v. Moreno*, 458 U.S. 1, 13, 17, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982); *Elkins v. Moreno*, 435 U.S. 647, 665, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978). *See generally* 8 U.S.C. § 1153 (categories of aliens eligible for "immigrant" visas); 8 U.S.C. § 1101(a)(15) (distinguishing "immigrant" from "nonimmigrant" and listing categories of nonimmigrant visas).[12] Unlike

12. Under the INA, the various types of "nonimmigrant" status each authorize recipients to enter the United States for a specific purpose, and generally prohibit the alien from establishing domicile in the United States. *Elkins*, 435 U.S. at 665, 98 S.Ct. 1338 ("Congress expressly conditioned admission [to the United States] for some purposes on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States."); *see generally* 8 U.S.C. § 1101(a)(15). In contrast, the various types of "immigrant" status generally allow recipients to enter the United States for the purpose of establishing the United States as their domicile. For example, individuals with nonimmigrant worker visas are authorized to work but they are precluded from establishing domicile in the United States. 8 U.S.C. § 1101(a)(15)(H). Similarly, individuals with

a valid immigrant visa, DACA is merely a form of deferred action and does not authorize the recipient to establish *domicile* in the United States. *Klinger,* 31 F.3d at 731 ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection."). This distinction is relevant because the Regulation requires "proof of *domicile.*" 6 C.S.R. § 10-3.010(9)(C) (emphasis added). Therefore, 6 C.S.R. § 10-3.010 does not violate the Equal Protection Clause because recipients of deferred action, including DACA recipients such as Ms. Doe, are not similarly-situated to other individuals with a valid "immigrant" status under the INA.

Additionally, the Regulation is not preempted by federal immigration law. "States can regulate areas of traditional state concern that might impact noncitizens [and] permissible state regulations include those that *mirror federal objectives* and *incorporate federal immigration classifications.*" *Ariz. Dream Act Coal. v. Brewer,* 855 F.3d 957, 972 (9th Cir. 2017), *cert. pending* (emphasis added) (hereinafter "*ADAC*"). The Regulation is a permissible state regulation because it makes in-state tuition rates, which is an area of traditional state concern, dependent upon an individual possessing "resident alien status," which simply incorporates an existing classification under federal immigration law (i.e. "immigrant" verses "nonimmigrant") and mirrors federal objectives (i.e. reserving certain benefits to individuals allowed to establish *domicile* in the United States). Missouri's Student Residency Regulation requires "proof of *domicile.*" There is nothing inconsistent with federal policy when the

Regulation requires aliens to have authorization to establish *domicile* in the United States before considering whether they have established *domicile* in Missouri. *See* 6 C.S.R. § 10-3.010(9)(C).

Ms. Doe contends that two federal cases, the United States Supreme Court case of *Toll v. Moreno,* 458 U.S. at 13, 102 S.Ct. 2977, and the Ninth Circuit Court of Appeals case of *ADAC v. Brewer,* 855 F.3d at 972, support her argument that the trial court's interpretation of the Regulation would be preempted by federal law and violate the Equal Protection Clause. We find these cases are distinguishable.

In *ADAC,* Arizona enacted a policy requiring applicants for a state driver's license to prove "authorized presence" in the United States. *Id.* at 964. The policy allowed most aliens, including certain recipients of deferred action, to use a work permit called an employment authorization document ("EAD") [13] to prove their authorized presence, while preventing DACA recipients from using the exact same document to prove their authorized presence. *Id.* Although the court did not actually decide the equal protection issue, it stated that Arizona's policy likely violated the Equal Protection Clause because the policy "purports to create its own independent definition" of what it means for an alien to be "authorized under federal law." *Id.* at 972. The court reasoned that DACA recipients with a valid EAD are similarly-situated in every relevant respect to other aliens who are granted a driver's license on the basis of their EAD, and that denying state benefits based on this new and irrelevant

---

nonimmigrant international student visas are authorized to study and perform limited work in the United States; however, they are precluded from establishing domicile in the United States. 8 U.S.C. § 1101(a)(15)(J).

13. Under the INA, when the federal executive branch grants an alien deferred action, it may also grant that individual authorization to work in the United States legally, resulting in the issuance of an EAD. The EAD itself, however, is not evidence of immigration status.

classification likely violated the Equal Protection Clause. *Id.* at 963. The court held that Arizona's policy of denying state driver's licenses to DACA recipients was preempted by federal immigration law because it "created new immigration classifications based on its independent view of who is authorized under federal law" and those new classifications conflicted with federal immigration law. *Id.* at 975. The basis of the court's preemption analysis was the state's refusal to give the same effect to the EADs of individuals who received the document through the DACA program as those of individuals who received an EAD through another federal immigration program, "even though the federal government treats their EADs the same in all relevant respects." *Id.* at 973.

Here, unlike the DACA recipients in *ADAC*, Ms. Doe is not similarly-situated to aliens charged the in-state tuition rate at SLCC because they possess a valid "immigrant" status under the INA. Unlike aliens with valid "immigrant" visas, Ms. Doe holds no immigration status authorizing her to establish *domicile* in the United States. *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection."). This distinction is relevant because the Regulation requires "proof of *domicile.*" 6 C.S.R. § 10-3.010(9)(C) (emphasis added). As explained above, aliens with a valid "immigrant" status are authorized to establish domicile in the United States, while DACA recipients have no such authorization. Moreover, the Regulation has nothing to do with Ms. Doe's EAD and does not purport to create any type of classification inconsistent with federal immigration law.

In *Toll*, the United States Supreme Court held that Maryland's state-university tuition policy denying residency status, and thus the lower in-state tuition rate, to

aliens holding G-visas was preempted by federal immigration law. *Toll*, 458 U.S. at 17, 102 S.Ct. 2977. The Court held that, under the INA, G-visa holders are explicitly allowed to establish domicile in the United States, yet Maryland's policy prohibited these aliens from establishing residency in the state. *Id.* This was a clear conflict because the right to establish a domicile in the United States was undermined by a state policy denying in-state residency. *Id.*

Here, unlike in *Toll*, the Regulation explicitly permits G visa holders to qualify for in-state tuition, *see* 6 C.S.R. § 10-3.010.7(B) ("Aliens ... holding G visas shall be entitled to resident status ..."), and our holding would not preclude aliens authorized to establish domicile in the United States from qualifying for in-state tuition. DACA does not constitute federal authorization for a recipient to establish domicile in the United States. Rather, it is a temporary, and revocable, reprieve from the threat of deportation. The Court in *Toll* explicitly recognized that its preemption analysis would differ under the facts of this case as applied to aliens, such as Ms. Doe, stating "when Congress has done nothing more than permit a class of aliens to enter the country temporarily, the proper application of the principle [of preemption] is likely to be a matter of some dispute." *Id.* at 13, 102 S.Ct. 2977.

The key fact in this case is that DACA does not confer any type of immigration "status" authorizing Ms. Doe to establish *domicile* in the United States. *See DACA Memo.* Neither party disputes this fact. Therefore, the trial court did not err in concluding that Ms. Doe does not possess "resident alien status, as determined by federal authority." Points I, II, and III are denied.

## Conclusion

We hold that the trial court correctly concluded DACA approval does not qualify as any type of "resident alien status, as determined by federal authority," and therefore Ms. Doe was not entitled to the in-district tuition rate at SLCC. Although we disagree with the trial court's holding that "resident alien status" means *only* aliens with LPR status, we affirm the trial court's judgment because it reached the correct result, even if for the wrong reason. *See Hulse*, 777 S.W.2d at 322. Our holding is limited to the specific facts of this case, and expresses no opinion concerning whether individuals with any other type of immigration status qualify for the in-state residency tuition rate under 6 C.S.R. 10-3.010(7). The judgment is affirmed.

Robert G. Dowd, Jr., J., concur.

Lisa Van Amburg, J., dissents in separate opinion.

Lisa Van Amburg, Judge, dissenting.

I agree that the preamble to House Bill 3 is unenforceable. Given that it was the sole impetus for the tuition policy prompting this lawsuit, we should end the inquiry here and direct SLCC to resume its previous practices. Instead, we have been pulled into the weeds of federal immigration and constitutional law in an attempt to interpret a residency regulation heretofore applied without conflict. In respect of judicial restraint, this court should resolve the case in a manner that simply restores the prior interpretation. Fearing the potential implications of the majority result, I must dissent.

SLCC changed its application of the regulation solely because of the preamble.[1] Only in response to Doe's challenge did SLCC assert that its new interpretation was valid even absent the preamble. But SLCC's new interpretation is directly contradicted by its previous practices. When a statute is ambiguous, "the actual construction given it for a long period for those charged with its administration, the supervising courts and the Legislature acquiescing therein, is regarded as strong evidence of its true meaning." *State ex rel. Chick v. Davis*, 273 Mo. 660, 201 S.W. 529, 530 (Mo. banc 1918). There is no dispute here that, prior to passage of H.B. 3, SLCC's actual construction of 6 C.S.R. 10-3.010 granted in-district tuition to students like Doe. Additionally, the legislature acquiesced in this interpretation by twice rejecting bills codifying the preamble language.[2] Legislative rejection "is much more decisive than non-action and clearly shows the legislature's view of its own intent." *L & R Distributing, Inc. v. Missouri Dept. of Revenue*, 529 S.W.2d 375 (Mo. 1975). Simply put, neither past practice nor legislative action supports SLCC's pivot. I would stop here.

However, impelled to wade deeper, I would conclude that Doe *is* eligible for the resident tuition rate under 6 C.S.R. 10-3.010. The opposite result creates constitu-

---

1. This fact is stipulated, and Doe provided further insight from articles cited in her reply brief in the trial court. SLCC's general counsel explained that SLCC had no choice but to charge DACA students the international tuition rate because failing to comply with the preamble would jeopardize SLCC's funding. Kameel Stanley, *Undocumented college students rally against higher tuition bills*, St. Louis Public Radio, Sept. 22, 2015. SLCC's chancellor similarly explained that the preamble required the school to charge the international rate. Kate Stoltzfus, *Colleges in Missouri Navigate an Uncertain Landscape for Undocumented Students*, Chron. of Higher Ed., Nov. 18, 2015.

2. H.B. 688, 98th Gen. Assemb., 1st Reg. Sess. (Mo. 2015); H.B. 1637, 97th Gen. Assemb. 1st Reg. Sess. (Mo. 2014).

tional questions that this court has a duty to avoid. A state policy treating DACA recipients differently than other aliens was recently invalidated by the United States Court of Appeals in *Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir.). In that case, the state of Arizona adopted administrative rules requiring that individuals applying for a driver's license provide proof that their presence in the U.S. was "authorized under federal law." In implementing this policy, the state accepted federally-issued work permits held by other non-citizens, including those receiving deferred action under other immigration categories, but rejected those held by DACA recipients. The state argued that DACA recipients were not similarly situated because their status did not derive from the Immigration and Naturalization Act (INA). The Ninth Circuit rejected that position and deemed the policy infirm on Equal Protection and Supremacy grounds. The Court expressly judged immigration "status" irrelevant to Arizona's state interest and further opined, "in determining which aliens shall be eligible to receive a state benefit, Arizona created a new immigration classification based on its independent view of who is authorized under federal law to be present in the United States." *Id.* at 975.

The *ADAC* Court's opinion confirms that DACA is "federal authority," rooted in the INA. Thus, even accepting the inference that "federal authority" is limited to immigration law,[3] this court is obligated to recognize DACA as a source of federal authority in determining whether Doe is a resident alien. "Resident alien" is not a defined term in the INA. "Alien" is defined as "any person not a citizen or national of the United States." "Residence" is defined as "the place of general abode;" meaning "his principal, actual dwelling place in fact, without regard to intent." Doe fits within these definitions, and DACA *authorizes* her to *reside* in the U.S. It makes no difference that DACA authorization is revocable; green cards are also revocable. "Domicile" is a separate inquiry under this state's residency regulation, and Doe satisfies it.[4] In my view, the inquiry could also end here. It is not the role of this court to assign distinctions between aliens residing here with the permission of the federal government.

Equally troublesome is the absence of discussion of other federal authorities that would appear to have relevance here. The Personal Responsibility and Work Opportunity Reconciliation Act (8 U.S.C. § 1621) and the Illegal Immigration Reform and Immigrant Responsibility Act (8 U.S.C. § 1623) authorize states to make undocumented immigrants eligible for certain public benefits, including in-state tuition. In *DeVries v. Regents of the University of California*, the California high court upheld a statute granting in-state tuition to undocumented immigrants who attended high school in California. 6 Cal.App.5th 574, 211 Cal.Rptr.3d 435 (2017). Conversely, in *State ex rel. Brnovich v. Maricopa County Community College*, an Arizona

---

3. I also decline to assume that "federal authority" is limited to federal immigration authority. "This Court must examine the language of the statutes as they are written. It cannot simply insert terms that the legislature has omitted." *Loren Cook Co. v. Dir. of Revenue*, 414 S.W.3d 451, 454 (Mo. 2013). Absent the word "immigration," in the regulation, we can and should consult whatever federal authority illuminates the issue. Ultimately, however, the Coordinating Board has the power and, in my view, the responsibility to revise the regulation to comport with the present landscape, including DACA.

4. "Domicile shall mean presence within a state with an intent of making the state a permanent home for an indefinite period." 6 C.S.R. 10-3.010(9)(C).

appellate court held that DACA students are "lawfully present" for specific purposes (*e.g.*, work) but not for others (*e.g.*, college). 242 Ariz. 325, 395 P.3d 714 (2017). I reject the latter implication, and Missouri has no similar statute. But more generally, the collective oversight of these Acts and related precedent underscores the imprudence deciding consequential questions of federal immigration law on this record,[5] particularly in light of *ADAC*'s constitutional cautions.

"It is a well-accepted canon of statutory construction that if one interpretation of a statute results in the statute being constitutional while another interpretation would cause it to be unconstitutional, the constitutional interpretation is presumed to have been intended." *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 838–39 (Mo. 1991). The canon of constitutional avoidance "allows courts to avoid the decision of constitutional questions. It is a tool for choosing between competing plausible interpretations," resting on the presumption that lawmakers "did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). "When a constitutional and an unconstitutional reading of a statute are equally possible, this Court must choose the constitutional one." *State ex rel. Neville v. Grate*, 443 S.W.3d 688, 695 (Mo. App. E.D. 2014). Here, the majority chooses the path peppered with constitutional questions and also purports to decide them. This is precisely what the doctrine of avoidance seeks to restrain. Consistent with that doctrine, this court must avoid SLCC's dubious interpretation of 6 C.S.R 10-3.010 and in-

stead choose the alternate route. To that end, the preferable interpretation of "resident alien status as determined by federal authority" is the previous one that included DACA recipients such as Doe.

To be sure, DACA does not confer a visa or create a pathway for citizenship, as only an Act of Congress can do so. But DACA is "federal authority" derived from the INA, and, by its terms, that authority instructs the Department of Homeland Security and other federal immigration agencies how to "enforce the nation's immigration laws" with respect to "certain young people who were brought to this country as children and know only this country as home."[6] Our state and this court cannot disregard the spirit and force of that directive. St. Louis is the only home that Doe has known since the fourth grade. She is not an "international student." Her presence here is not unlawful. Prior to passage of H.B. 3 containing the preamble that we all agree is irrelevant, Doe would have paid in-district tuition. Doe resides and works in the SLCC district and pays Missouri income taxes, which fund the very institution now denying her residency based solely on an unenforceable preamble. This result is absurd and wholly avoidable. There is a legally plausible and constitutionally sound alternative that is also the just result on these facts. We should choose it.

---

**5.** Although Doe's brief contains a footnote citing sister state statutes providing for resident tuition rates for undocumented immigrants, neither party cites the underlying federal statutes or related jurisprudence.

**6.** Memorandum from DHS Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).