# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 22, 2023        Decided December 15, 2023

No. 22-5258

SALINE PARENTS, AN UNINCORPORATED ASSOCIATION, ET AL.,
APPELLANTS

v.

MERRICK B. GARLAND, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02775)

———

*Robert J. Muise* argued the cause for appellants. With him on the briefs was *David Yerushalmi*.

*Mark R. Freeman*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern* and *John S. Koppel*, Attorneys.

Before: RAO and PAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: On October 4, 2021, the Attorney General of the United States, Merrick Garland, issued a one-page memorandum ("Memorandum") to various units in the Department of Justice ("DOJ" or "Government"), expressing concern over a spike in reported incidents involving harassment, intimidation, and threats of violence against school administrators, board members, teachers, and staff. The Memorandum indicated that "[w]hile spirited debate about policy matters is protected under our Constitution, that protection does not extend to threats of violence or efforts to intimidate individuals based on their views." Supplemental Joint Appendix ("S.J.A.") 2. The Memorandum instructed DOJ staff to investigate the problem and discuss strategies for addressing the issue. The Federal Bureau of Investigation ("FBI") subsequently sent an email ("FBI Email") advising its agents that it had created an internal mechanism to track investigations and threat assessments relating to the issues raised in the Memorandum.

Appellants in this case include an unincorporated association ("Saline Parents") and six individuals who reside in Saline, Michigan and Loudoun County, Virginia. They filed suit in the District Court against the Attorney General, claiming that the foregoing actions by the Government are unlawful because they are intended to silence Appellants and others who oppose "progressive" curricula and policies in public schools. Appellants say that they strongly and publicly voice opposition to "the divisive, harmful, immoral, destructive, and racist agenda of the 'progressive' Left." First Amended Complaint ("Compl.") ¶ 106, Joint Appendix ("J.A.") 28. And they contend that, because their protest activities include only constitutionally protected conduct and never threats of criminal

violence, they have been impermissibly targeted by what they term the "AG Policy." Appellants allege the AG Policy directs the Government "to use federal law enforcement resources to silence parents and other private citizens" who object to the "progressive" agenda. *Id.* ¶ 2, J.A. 6. Appellants seek a declaration that the purported AG Policy is unlawful, along with an injunction barring both the alleged policy and any actions taken to enforce it.

The Government has acknowledged, both before the District Court and this court, that the professed activities cited by Appellants in their Complaint fall outside the scope of the Memorandum and are fully protected by the Constitution. The Government has also consistently maintained that Appellants are not targets of any purported AG Policy.

The District Court dismissed the case for lack of standing, holding that Appellants failed to demonstrate injury in fact from the contested Government actions. *See Saline Parents v. Garland*, 630 F. Supp. 3d 201, 205 (D.D.C. 2022). We agree that Appellants lack standing to pursue this action. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). In addition, we agree with the Government that Appellants' lawsuit is not ripe for adjudication. *See Trump v. New York*, 141 S. Ct. 530, 536 (2020) (per curiam) ("At the end of the day, the standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature.").

## I.  BACKGROUND

### A.  Factual Background

As noted above, on October 4, 2021, Attorney General Garland sent a one-page Memorandum to various DOJ units, noting "a disturbing spike in harassment, intimidation, and

threats of violence against school administrators, board members, teachers, and staff who . . . run[] our nation's public schools." S.J.A. 2. The Memorandum acknowledged that "[w]hile spirited debate about policy matters is protected under our Constitution, that protection does not extend to threats of violence or efforts to intimidate individuals based on their views." *Id.* The Memorandum stated that "[t]hreats against public servants are . . . illegal," and "[t]hose who dedicate their time and energy" to running schools should "be able to do their work without fear for their safety." *Id.* The Memorandum stated further that, "[i]n the coming days," the DOJ would "announce a series of measures designed to address the rise in criminal conduct directed toward school personnel." *Id.* And the Memorandum instructed the FBI, working with each United States Attorney, to "convene meetings" in order to "facilitate the discussion of strategies for addressing threats," and to "open dedicated lines of communication for threat reporting, assessment, and response." *Id.*

The FBI Criminal Investigative Division and Counterterrorism Division subsequently sent a joint internal email to its agents stating that it had created what it called a "threat tag" for internal tracking of "investigations and assessments of threats" directed against school personnel. S.J.A. 4. The FBI Email explained that the tag would "help scope this threat" and "provide an opportunity for comprehensive analysis of the threat picture for effective engagement with law enforcement partners." *Id.* Importantly, neither the Memorandum nor the FBI Email announced any new regulations or enforcement policies, or purported to issue any directives outside of the DOJ. And neither the Memorandum nor the FBI Email mentioned or even obliquely alluded to Appellants in this case.

Appellants are Saline Parents, an unincorporated association of parents and "concerned private citizens" in Saline, Michigan, along with six individual parents who reside in Saline, Michigan and Loudoun County, Virginia. Appellants describe themselves as "law-abiding citizens who want to speak in defense of their children and against the divisive, harmful, immoral, destructive, and racist agenda of the 'progressive' Left." Compl. ¶ 106, J.A. 28. Appellants claim they are targeted by the DOJ because they strongly and publicly oppose these "progressive" policies adopted by school boards. They argue that as a direct result of the Government's actions, their exercise of fundamental rights has been chilled and their reputations impugned. However, Appellants point to no concrete facts to support these claims.

According to Appellants, their advocacy includes: making their opposition known publicly at school board meetings, *id.* ¶ 12, J.A. 8; maintaining the website content of Saline Parents, *id.* ¶ 14, J.A. 8; passionately addressing the school board, *id.* ¶ 27, J.A. 10; seeking to recall school board members by collecting signatures, writing letters, and attending press conferences, *id.* ¶ 30, J.A. 11; writing a scathing editorial, *id.*; clapping instead of using jazz hands, *id.* ¶ 32, J.A. 11; leading meeting attendees in singing the National Anthem, *id.* ¶ 33, J.A. 11; initiating a student walk out as well as a rally, *id.* ¶ 34, J.A. 12; posting on social media, *id.* ¶ 35, J.A. 12; and organizing a shoe drop protest, where hundreds of shoes were left in front of school administrative offices to represent the mass exodus of students from public schools, *id.* ¶ 36, J.A. 13. Appellants assert that their conduct at school board meetings did not include making threats of criminal violence. *Id.* ¶ 65, J.A. 18. Appellants also declare that they intend only to engage in constitutionally protected conduct. *Id.* ¶ 39, J.A. 13. The Government agrees that the activities detailed by Appellants in their Complaint are constitutionally protected.

Appellants claim that, after their advocacy, the National School Boards Association submitted a letter to President Biden, alleging that public school educators increasingly faced threats of violence and acts of intimidation. The letter stated that "acts of malice, violence, and threats against public school officials" were "a form of domestic terrorism." *See Saline Parents*, 630 F. Supp. 3d at 208. Appellants assert that this letter was drafted in conjunction with the Biden administration "to create the pretext for the AG Policy," Compl. ¶¶ 75-77, J.A. 21, and that the letter was the sole basis for the Memorandum published on October 4, *id.* ¶ 76, J.A. 21.

Appellants allege nothing to suggest that they have ever been hampered in their protest activities by any local or federal law enforcement agencies or actions, prosecutions, civil suits, or official notices of any sort. And they make no claims to suggest that the DOJ generally or the FBI specifically have done anything directed at them to foreclose their rights to express their views.

### B. Procedural History

On October 19, 2021, Appellants filed an action in the District Court against Attorney General Garland in his official capacity. As outlined above, the Complaint contends that the Government adopted an unlawful policy – i.e., the so-called "AG Policy" – to silence those who oppose the "progressive" agenda being implemented in public schools. *Id.* ¶ 2, J.A. 6. Appellants believe they are the "very targets" of this alleged AG Policy. *Id.* ¶ 74, J.A. 20. The Complaint recounts that school board members have complained about parents "attacking the board" by calling into question the board's integrity and morals. *Id.* ¶ 89, J.A. 24. The Complaint also references a photo of one marked Homeland Security vehicle

outside a school board meeting held in Fairfax, Virginia, *id.* ¶ 87, J.A. 23, although Appellants do not say they personally were present at that meeting. Finally, the Complaint contends that the Attorney General is personally and ideologically vested in silencing opposition to critical race theory and other "progressive" curricula and policies promoted by local school boards, and that he is directing the power and resources of the DOJ to do just that. *Id.* ¶ 101, J.A. 27.

The Complaint pleads causes of action based on the First Amendment, equal protection under the Fifth Amendment, protection of parental rights under the Fifth Amendment, and the Religious Freedom Restoration Act. *Id.* ¶¶ 108-40, J.A. 28-32. It seeks a declaration that the purported AG Policy is unlawful, as well as an injunction barring the policy and any federal actions taken pursuant to it. *Id.* ¶¶ 2-3, J.A. 6.

The District Court dismissed the case for lack of standing. *See Saline Parents*, 630 F. Supp. 3d at 205. It held that Appellants failed to allege facts sufficient to show cognizable injuries from either a threat of enforcement or reputational harm. *Id.* Finding an absence of jurisdiction for want of standing, the District Court had no occasion to consider the parties' other arguments and granted the Government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). Appellants now appeal that dismissal.

## II.  ANALYSIS

### A.  Standard of Review

We review *de novo* a dismissal for lack of subject matter jurisdiction. *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 518 (D.C. Cir. 2016). On review of a motion to dismiss, we must "accept the well-pleaded factual

allegations as true and draw all reasonable inferences from those allegations in [Appellants'] favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). However, "[t]hreadbare recitals" and "mere conclusory statements" do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We do not accept inferences unsupported by the facts set out in the complaint. *Arpaio*, 797 F.3d at 19 (citing *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). Nor do we assume the truth of legal conclusions. *Id.* (citing *Iqbal*, 556 U.S. at 678).

## B. Standing

The "irreducible constitutional minimum of [Article III] standing" consists of three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). As the party invoking the court's subject matter jurisdiction, the plaintiff bears the burden of establishing the elements of standing. *Id.* at 2207. "Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, *each element* must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (first emphasis added). Failure to establish any one element requires dismissal of the action. *See, e.g.*, *TransUnion*, 141 S. Ct. at 2214 (dismissing for lack of standing claims in which plaintiffs failed to show injury in fact).

"This case concerns the injury-in-fact requirement, which helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Before this court, the Government contends that Appellants lack standing to pursue this action because they have failed to allege adequate facts to show any injury from either the threat of enforcement or reputational harm. The Government argues that:

> Plaintiffs allege that their peaceful speech objecting to school policies is chilled by a purported Department of Justice policy that in some way targets them based on their viewpoint. The alleged AG Policy does not "arguably proscribe[]" plaintiffs' conduct, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quotation marks omitted), because it is not "regulatory, proscriptive, or compulsory in nature," *Laird v. Tatum*, 408 U.S. 1, 11 (1972). And even if it were, the policy does not apply to plaintiffs' constitutionally protected conduct. . . . For similar reasons plaintiffs have not demonstrated standing to pursue a claim of reputational injury.

Brief for Appellee 15-17.

As to Appellants' alleged threat-of-enforcement injury, the Government's reliance on *Laird v. Tatum*, 408 U.S. 1 (1972), is on the mark. In *Laird*, the Supreme Court made it clear that a cognizable chilling injury cannot "arise merely from the individual's knowledge that a governmental agency was engaged in certain [investigative and data-gathering] activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some . . . action detrimental to that individual." *Id.* at 11.

Rather, the Government's exercise of power must be "regulatory, proscriptive, or compulsory." *Id.* Accordingly, the Court in *Laird* declined to entertain a suit alleging that an Army program to gather intelligence on peaceful, civilian political activity chilled plaintiffs' lawful exercise of their First Amendment rights. *Id.* at 2-3. As in *Laird*, Appellants here claim only that their lawful activities are being chilled by the mere existence of governmental investigation, and at most indicate a fear that the Government, armed with the fruits of their data gathering, may take action against them in the future. This is insufficient to show injury in support of standing.

The principal Supreme Court cases cited by Appellants to counter *Laird* are inapposite, because the plaintiffs bringing pre-enforcement challenges in those cases proffered factual allegations that supported concrete threats of enforcement. *See, e.g.*, *Susan B. Anthony List*, 573 U.S. at 166 (finding a credible threat of enforcement where petitioners "alleged an intent to engage in the same speech that was the subject of a prior enforcement proceeding"); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-30, 137 (2007) (exercising jurisdiction over a dispute regarding payment obligations, despite challenger making required payments under protest, because cessation of payment would expose challenger to liability); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (holding petitioner's alleged threats of prosecution not speculative, because he had "been told by the police" that "he will likely be prosecuted" if he continued handbilling); *Dombrowski v. Pfister*, 380 U.S. 479, 487-88 (1965) (finding sufficient injury from chilling effect where appellant and intervenors had previously been arrested and charged with violations of the two statutes being challenged).

Here, Appellants fail to demonstrate that the Government has in any way threatened imminent, rather than hypothetical,

enforcement action against them. *See Lujan*, 504 U.S. at 560. Indeed, Appellants declare they are peaceful, law-abiding citizens; nothing in the Memorandum suggests otherwise. Appellants assert they engage only in constitutionally protected speech; the Memorandum clearly states that the DOJ has no issue with speech protected by the Constitution. The Memorandum, which announces initial plans by the DOJ to investigate and strategize internally, does not threaten imminent legal action against anyone, and certainly not against Appellants.

What is telling here is that Appellants' allegations simply do not plausibly support the belief that they are targets of the DOJ. For example, they allege that school board members have complained about parents "attacking the board," but they do not claim that the DOJ took or threatened to take legal action against Appellants in response. Appellants also offer a photo of a marked Homeland Security vehicle parked outside a school board meeting, held in a city that is neither Saline nor in Loudoun County. Appellants do not allege they attended this meeting, nor that any enforcement proceeding was threatened against those who did. Finally, Appellants assert that the Attorney General is personally and ideologically vested in broadly silencing all opposition to "progressive" curricula. Appellants even go so far as to declare that the Attorney General issued the Memorandum for personal gain, but they offer nothing to support this accusation. In sum, Appellants have not come close to demonstrating that the Government is focused on them or their peaceful activities.

Appellants' theory of reputational injury suffers similar deficiencies. Appellants allege that the contested Government actions have impugned their public reputations by designating them as "criminal threats" and "domestic terrorists." However, even on a generous reading of the factual allegations in the

Complaint, there is nothing to indicate that the DOJ has designated Appellants as "criminal threats" or "domestic terrorists," as they claim. The contents of the Memorandum and the FBI Email do not pertain to Appellants' professed activities. Appellants assert, and the Government does not dispute, that all their alleged activities are constitutionally protected. As such, Appellants fail to offer any specific action that would deem them a "criminal threat." And there is nothing in the contested DOJ documents that even refer to a "domestic terrorism" threat. Rather, this term comes from a letter sent to the White House by a private organization, the National School Boards Association. Appellants claim the letter was drafted in collusion with the Biden administration, and that it served as the sole basis for the Memorandum. Nothing supports these conclusory statements of collusion. A letter from a private entity unaffiliated with the Government, which contains the only reference in the record to "domestic terrorism," cannot plausibly be attributed to the Attorney General. In fact, neither the Memorandum nor the FBI Email even alludes to the letter. Ultimately, Appellants have not offered anything to show that the Government labeled them in any way, let alone impugned their reputations. Any reputational injury Appellants believe they have suffered is therefore insufficient to satisfy Article III. *See Arpaio*, 797 F.3d at 19 (noting courts may not "accept inferences that are unsupported by the facts set out in the complaint" (quoting *Islamic Am. Relief Agency*, 477 F.3d at 732)).

In addition, the pre-enforcement claim in this case is not ripe for adjudication. Indeed, the factors discussed above that undermine Appellants' claim to standing serve to confirm that "this case is riddled with contingencies and speculation that impede judicial review." *Trump*, 141 S. Ct. at 535. "At the end of the day, the standing and ripeness inquiries both lead to the

conclusion that judicial resolution of this dispute is premature." *Id*. at 536.

### C. Ripeness

We have made clear that "[t]he ripeness doctrine, even in its prudential aspect, is a threshold inquiry that does not involve adjudication on the merits and which may be addressed prior to consideration of other Article III justiciability doctrines." *In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011) (citing *Toca Producers v. FERC*, 411 F.3d 262, 265 n.* (D.C. Cir. 2005)). As the Supreme Court has explained:

> Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction, but, even in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion.

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citations and quotations omitted).

A claim is premature and therefore unripe for judicial review if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 141 S. Ct. at 535 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). An unripe claim must be dismissed. *Cause of*

*Action Inst. v. Dep't of Just.*, 999 F.3d 696, 704 (D.C. Cir. 2021). To determine whether a dispute is ripe for adjudication, we evaluate "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

There can be little doubt here that the pre-enforcement issues raised in this case are not fit for adjudication. As noted above, Appellants' Complaint is "riddled with contingencies and speculation that impede judicial review." *Trump*, 141 S. Ct. at 535. Neither the Memorandum nor the FBI Email threatens imminent enforcement action generally, much less against Appellants specifically. The contested DOJ documents do not establish any regulatory actions or even purport to offer viable policy statements. The Memorandum simply announces the Attorney General's concerns about "a disturbing spike in harassment, intimidation, and threats of violence" against school personnel. S.J.A. 2. It proposes nothing more than some measures to "facilitate the discussion of strategies for addressing threats," and to "open dedicated lines of communication for threat reporting, assessment, and response." *Id.* Likewise, the FBI Email creates a "threat tag" only for the purpose of "scop[ing] this threat" and "provid[ing] an opportunity for comprehensive analysis." S.J.A. 4. Apart from announcing plans to gather information for discussions, the Government has not yet directed its agents to take any concrete action. These initial plans to investigate a matter of potential concern and to strategize internally are routine functions of the Government.

Nevertheless, Appellants invite this court to give credence to their surmise that the Government will not only decide to take enforcement action at some point, but that it will take action against Appellants in particular. We decline the invitation because this would be anathema to the judicial

function. A justiciable controversy may not ask a court to "advis[e] what the law would be upon a hypothetical state of facts," but rather must "admit[] of specific relief through a decree of a conclusive character." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937). Absent a concrete factual context, determination of the scope and constitutionality of a purported government policy "in advance of its immediate adverse effect . . . involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Int'l Longshoremen's & Warehousemen's Union v. Boyd*, 347 U.S. 222, 224 (1954). "[J]udicial appraisal [of the issue] is likely to stand on a much surer footing in the context of a specific application of [agency policy] than could be the case in the framework of [a] generalized challenge." *Cause of Action*, 999 F.3d at 705 (alterations in original) (quoting *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 396 (D.C. Cir. 2013)).

Clearly, in the present case, it is much "too speculative whether the problem [Appellants] present[] will ever need solving." *Texas v. United States*, 523 U.S. at 302. Appellants believe they are targets of the DOJ. But, as detailed above, there is nothing in the contested Memorandum or in the FBI Email to support this claim. Whether Appellants will ever become the subjects of an FBI investigation or enforcement proceeding remains to be seen. By their own account, Appellants are not presently threatened with any enforcement proceeding against them. Indeed, the Memorandum expressly assures that the Constitution protects "spirited debate," S.J.A. 2, and Appellants assert they only "intend to engage in constitutionally protected conduct," Compl. ¶ 39, J.A. 13, never threats of criminal violence, *id.* ¶ 65, J.A. 18. The Government agrees with Appellants that the activities alleged in their Complaint comport with the exercise of constitutional rights, and it confirms that those activities fall outside the scope of the Memorandum. In short, Appellants' Complaint contains

no factual allegations that could plausibly lead to the conclusion that their advocacy fits within the ambit of the "disturbing" conduct at issue in the Memorandum.

Finally, our disposition of this pre-enforcement challenge will not subject Appellants to any legally cognizable "hardship." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. Appellants have not lost any First Amendment rights. The Memorandum and the FBI Email impose no obligations outside of the DOJ. Neither document proscribes any activity. Appellant "is not required to engage in, or to refrain from, any conduct" as a result of the challenged DOJ documents. *Texas v. United States*, 523 U.S. at 301. Although Appellants complain of a chilling effect on their speech, the Government has not in any way restricted or regulated Appellants' activities. Therefore, Appellants have not suffered any "immediate and significant" hardship sufficient to "outweigh institutional interests in the deferral of review." *Action All. of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986).

At bottom, Appellants' pre-enforcement claim rests on hypotheticals that are too remote, speculative, and abstract for judicial review. The Supreme Court has been clear, time and again, that a case is unripe for review when "[a]ny prediction how the [Government] might eventually implement . . . [a] policy is 'no more than conjecture.'" *Trump*, 141 S. Ct. at 535 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). For us to embrace Appellants' argument that the Government will target peaceful protests of school policies, despite the Memorandum expressly promising otherwise, would require this court to depart from the land of record evidence and venture into the thickets of fanciful speculation. "We do not have sufficient confidence in our powers of imagination[.]" *Texas v. United States*, 523 U.S. at 301. Given the uncertainty with how events may play out, the matter raised by Appellants

is not currently fit for our review, and withholding consideration will not impose hardship on Appellants.

### III. Conclusion

For the reasons set forth above, we affirm the dismissal of Appellants' action for lack of Article III standing and want of ripeness.

*So ordered.*